## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MOBITV, INC., *et al.* | Case No. 21-10457 (___) |
| Debtors.[1] | Joint Administration Requested |

## DECLARATION OF TERRI STEVENS IN SUPPORT OF FIRST DAY MOTIONS

I, Terri Stevens, hereby declare that the following is true and accurate to the best of my knowledge, information, and belief:

1.      I am the Chief Financial Officer of MobiTV, Inc. ("MobiTV") and its debtor affiliate MobiTV Service Corporation ("Services Corp." and together with MobiTV, the "Debtors" or the "Company").  I have been employed by the Debtors since 2005.  Before joining the Company, I was the controller at RagingWire Enterprise Solutions; Vice President, Controller, and Interim Chief Financial Officer at Excite@Home; Vice President of Finance at Xenote, Inc.; Director of Finance and Controller at PointCast; and a Senior Associate at Coopers & Lybrand (now PricewaterhouseCoopers).

2.      I am familiar with the Debtors' books and records, day-to-day operations, business, and financial condition.  I am also familiar with the facts and circumstances surrounding the First Day Motions (defined below) and the commencement of these chapter 11 cases.

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: MobiTV, Inc. (2422) and MobiTV Service Corporation (8357). The Debtors' mailing address is 1900 Powell Street, 9th Floor, Emeryville, CA 94608.

3.    I submit this declaration (the "Declaration") in support of the Debtors' chapter 11 petitions and "first day" motions described in further detail below (collectively, the "First Day Motions"). Except as otherwise indicated, the facts set forth herein are based upon (a) my personal knowledge of and familiarity with the Debtors' operations and finances, (b) information learned from my review of the relevant documents and information supplied to me by other members of the Debtors' management, the Debtors' professionals, and employees of the Debtors working under my supervision, and (c) my opinions based upon experience, knowledge, and information concerning the Debtors and the industry in which the Debtors operate. If called upon to testify, I would and could testify competently to the facts set forth herein.

4.    I am authorized to submit this Declaration in support of the First Day Motions. Part I of this Declaration describes the business of the Debtors and the circumstances surrounding the commencement of these chapter 11 cases.[2]  Part II of this Declaration sets for the relevant facts in support of the First Day Motions filed concurrently herewith.

## PART I - BACKGROUND

### A.    Overview of the Debtors' Business and Operations

5.    Founded in 2000, the Debtors are the first company to bring live and on-demand television to mobile devices and are a leader in application-based television and video delivery solutions. More specifically, the Debtors provide end-to-end internet protocol streaming television services ("IPTV") *via* a proprietary cloud-based, white label application (the "IPTV Application"). The IPTV Application is fully customizable, allowing the Debtors' customers, generally television operators, broadband providers, and cellular device carriers, to provide a fully branded and customized video streaming platform on retail devices such as Roku, Apple

---

[2]    A capitalized term used but not defined herein shall have the meaning ascribed to it in the applicable First Day Motion.

TV, Amazon Fire TV, Xbox, and smart TVs, as well as other devices utilizing Android and iOS operating systems to their subscribers.

6.     In support of the IPTV Application, the Debtors have secured certain transportation rights (the "Transportation Rights") by which the Debtors provide content through the IPTV Application from over 375 leading video content providers such as HBO, Fox, the Walt Disney Company, Viacom, NBC, CBS, and others.  The Transportation Rights held by the Company, coupled with the IPTV Application, simplify the content sourcing and delivery mechanics required to provide high quality streaming services to consumer end users through a single application feed, and significantly reduce the costs of the Company's customers to provide content to their subscribers.

7.     In this regard, the Company holds key contracts with T-Mobile USA, Inc. ("T-Mobile") and over 120 cable/broadband television (also referred to as "pay TV" or "premium television") providers to deliver streaming content to over 300,000 end-user subscribers *via* business customer-specific branded iterations of the IPTV Application.

8.     In support of the Debtors' operations and IPTV Application, and as of the Petition Date, the Debtors utilize the services of approximately 86 employees in critical functions such as engineering, sales and marketing, operations, and back office and administrative positions.  Most of the Debtors' employees are based in the Company's Emeryville, California headquarters.  The Debtors also utilize the services of eight independent contractors and certain staffing firms based in India.

9.     As of the Petition Date, the Company had total assets of approximately $19 million and total liabilities of $75 million.  In calendar year 2020, the Company generated approximately $13.5 million in revenue, resulting in an operating loss of approximately $34

3

million. The Company derives its revenue from contracts with its subscription television customers, T-Mobile, and certain other broadband and cellular service providers, who utilize the Company's IPTV Application.

### B.   Corporate Structure and Management

10.   MobiTV is a privately held Delaware corporation.  Services Corp. is also a Delaware corporation and is wholly owned by MobiTV. As of the Petition Date, Services Corp. had no operations, no employees, and no material assets, but was an obligor on the Prepetition Loan Facility (as such term is defined herein below). MobiTV and Services Corp. hold 99% and 1%, respectively, of the outstanding equity in non-Debtor MobiTV India Services Private Limited ("MobiTV India"), an Indian entity created to facilitate the Debtors' presence in India. As of the Petition Date, MobiTV India had no operations, no employees, no material assets, and is not an obligor on the Prepetition Loan Facility.

### C.   Capital Structure

#### i.   Secured Debt

11.   As of the Petition Date, the Company's aggregate funded and matured secured debt obligations were approximately $25 million, plus accrued interest and expenses.  This amount is owed to the Debtors' sole prepetition secured lender, Ally Bank (the "Prepetition Lender").  On February 3, 2017, the Debtors and the Prepetition Lender entered into that certain *Loan and Security Agreement* (as amended, the "Prepetition Loan Agreement").  Under the terms of the Prepetition Loan Agreement, the Debtors borrowed $10 million (the "Prepetition Term Loan").  The Prepetition Loan Agreement also provided a revolving loan in an amount up to $5 million, which was fully drawn upon the closing (the "Prepetition Revolver" and, together with the Prepetition Term Loan, the "Prepetition Loan Facility;" all amounts owing under the

4

Prepetition Loan Facility, the "Prepetition Indebtedness;" and all documents evidencing and securing the Prepetition Indebtedness, the "Prepetition Loan Documents"). The original maturity of the Prepetition Loan Facility was February 3, 2019. However, over a series of seventeen (17) amendments and forbearance agreements, the maturity date was effectively extended to January 2021.

12.     On January 29, 2021, the Debtors and the Prepetition Lender entered into that certain *Forbearance Agreement and Eighteenth Amended to Loan and Security Agreement* whereby T-Mobile agreed to provide $2.5 million in bridge financing through the existing Prepetition Loan Facility. To facilitate the transaction, T-Mobile and the Prepetition Lender entered into that certain *Junior Participation Agreement* dated January 29, 2021, whereby T-Mobile purchased a "last-out" participation interest in certain "Bridge Loans" extended by the Prepetition Lender to the Debtors under the Prepetition Loan Facility.

13.     On February 12, 2021, the Debtors and the Prepetition Lender entered into that certain *Second Forbearance Agreement and Nineteenth Amendment to Loan and Security Agreement* (the "Nineteenth Amendment"), whereby T-Mobile agreed to provide an additional approximate $2.3 million in bridge financing through the existing Prepetition Loan Facility. Pursuant to the Nineteenth Amendment, the Prepetition Lender agreed to forbear until February 26, 2021.

14.     The Prepetition Loan Facility is secured by substantially all of the Company's assets, including intellectual property, accounts receivable, inventory, and equipment. The Company also entered into various deposit account control agreements with the Prepetition Lender.

### ii.    PPP Loan

15.    In April 2020, and with the consent of the Prepetition Lender, debtor MobiTV, Inc. submitted to Silicon Valley Bank ("SVB") an application to borrow funds made available under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), which added a new product titled the Paycheck Protection Program (the "PPP") to the U.S. Small Business Administration's Loan Program.  On April 21, 2020, SVB approved and funded the Company's PPP loan application in the approximate amount of $3 million (the "PPP Loan").  Prior to the Petition Date, the Company applied for the balance of the PPP Loan to be forgiven.  However, as of the Petition Date, the balance of the PPP Loan ($3 million) remained outstanding.

### iii.    Unsecured Convertible Notes

16.    Rackspace Note.  On October 9, 2020, debtor MobiTV, Inc. and Rackspace International Holdings, Inc. ("Rackspace") entered into that certain *Subordinated Convertible Promissory Note* (the "Rackspace Note") pursuant to which Rackspace loaned the Company $4 million.  As of the Petition Date, the aggregate principal amount outstanding under the Rackspace Note is $4 million.  The obligations under the Rackspace Note are unsecured.

17.    Oak Investment Notes.  Debtor MobiTV, Inc. is party to three (3) outstanding notes (together, the "Oak Investment Notes"): (a) that certain *Subordinated Convertible Promissory Note*, dated as of August 6, 2020, with a principal outstanding amount of approximately $4 million; (b) that certain *Subordinated Convertible Promissory Note*, dated as of December 14, 2020, with a principal outstanding amount of approximately $1 million; and (c) that certain *Subordinated Convertible Promissory Note*, dated as of December 30, 2020, with a principal outstanding amount of approximately $300,000.  As of the Petition Date, the aggregate

principal amount outstanding under the Oak Investment Notes is approximately $5.3 million. The obligations under each of the Oak Investment Notes are unsecured.

### iv.    Trade Debt

18.     In the ordinary course of business, the Debtors incur trade credit on varying terms.  As of the Petition Date, the Company estimates that there is approximately $15 million in general unsecured claims relating to trade debt.

### D.    Circumstances Leading to the Commencement of These Chapter 11 Cases

19.     Despite growing revenue and increasing subscriber and customer bases, the Debtors have been incurring substantial operating losses. As set forth above, the Debtors generated a net operating loss of approximately $34 million in calendar year 2020.

20.     Although the Company projected significant and material subscriber and revenue growth for 2020, the COVID-19 pandemic and related stay-at-home orders, materially impaired the Company's growth opportunities.  As a result, the Company found itself with limited liquidity and at risk of default under its debt agreements.  On August 6, 2020, the Debtors and Ally Bank entered into that certain *Fifteenth Amendment to Loan and Security Agreement*, dated August 6, 2020 (the "Fifteenth Amendment"), which provided for a limited forbearance on the Prepetition Loan Facility. In exchange for this forbearance, the Company was required to engage in good faith efforts to raise additional capital from the sale of equity or through new financing in a sufficient amount to repay the Debtors' obligations under the Prepetition Loan Facility.

### E.    Prepetition Sale Efforts

21.     In accordance with the terms of the Fifteenth Amendment, in August 2020, the Debtors engaged FTI Capital Advisors LLC ("FTI") to assist with the Debtors' evaluation of strategic alternatives. The Debtors, with FTI's assistance, evaluated various avenues to improve

the Debtors' liquidity and financial position, including a structured marketing effort to secure new debt or equity capital partners to provide for a refinancing of the Prepetition Loan Facility and provide operating liquidity to fully bridge the Debtors' business plan to positive cash flow in 2022.

22.     As part of this process, FTI and the Debtors contacted seventy-nine (79) potential capital sources, ranging from strategic investors, venture capital funds, third party lenders, and media and technology focused investors, of which twenty-two (22) executed non-disclosure agreements. While the Debtors entered into advanced negotiations with several potential capital providers, including a period of exclusive negotiations with several potential investors, negotiations to structure an acceptable out-of-court refinancing were unsuccessful.

**F.     The Commencement of the Chapter 11 Cases**

23.     The Company ultimately concluded that given the significant challenges in achieving positive free cash flows in the near term, the business likely would not be viable on a stand-alone basis absent a strategic transaction.  Further, in light of the Company's most recent marketing process, and the desire of potential acquirers to purchase the Company's assets free and clear of any liabilities, the Company believed it would be unable to consummate a strategic transaction out of court - especially given its limited available liquidity.

24.     Accordingly, prior to the Petition Date, the Company engaged in extensive negotiations with the Prepetition Lender and T-Mobile regarding, among other things, a potential auction sale process in the context of a chapter 11 proceeding.  Ultimately, the Company, the Prepetition Lender, and T-Mobile mutually determined that, among the strategic alternatives to be considered, the Company should prepare for a potential sale process that could be implemented through the filing of chapter 11 cases to maximize the value of the Company and

8

its assets.  In connection therewith, an affiliate of T-Mobile, TVN Ventures, LLC (the "DIP Lender") agreed to provide the Company with postpetition financing on a subordinated basis to the Prepetition Loan Facility.

25.     Despite the commencement of these chapter 11 cases, the Company fully intends to continue to run an extensive marketing process.  With the Company's continued employment of FTI, whose marketing strategy will include reengaging parties who originally showed interest in the Company's assets in addition to new potential buyers, the Company is hopeful that such efforts will result in securing a purchaser of the Company's assets and possible stalking horse bidder.

26.     Accordingly, shortly hereafter, the Company will file a sale procedures motion to establish a formal marketing process designed to maximize the value of the Company's assets. In connection therewith, the Company contemplates a robust marketing process followed by an open auction. The Company will also seek authority to enter into a stalking horse bid and designate a stalking horse purchaser in the Company's business judgment (after consultation with the DIP Lender, the Prepetition Lender, and any official committee of unsecured creditors, as applicable) up to and including 7 calendar days prior to the bid deadline. This optionality will allow the Company to continue to work towards securing a stalking horse bid as a backstop to the sale process, while enabling the process to proceed as efficiently and economically as possible.

## **PART II – FIRST DAY MOTIONS**

27.     In order to enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases, the Debtors have requested various types of relief in

the First Day Motions filed concurrently herewith.  A summary of the relief sought in the First Day Motions is set forth below.

28.     I have reviewed each of the First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions: (a) is necessary to enable the Debtors to operate in these chapter 11 cases with minimal disruption to their current business operations; and (b) is essential to preserve the Debtors' value as a going concern and to maximize the value of the Debtors' estates for the benefit of all stakeholders.

## A.     <u>Cash Management Motion</u>

29.     The Debtors seek entry of an order (i) authorizing the Debtors to (a) continue operating the Cash Management System (as defined below), (b) open a new "DIP Funding Account" (as defined below), (c) honor and pay the Bank Fees (as defined below) in the normal course, (d) maintain existing business forms, and (e) granting certain related relief, as described more fully in the motion (the "<u>Cash Management Motion</u>").

### i.     The Cash Management System

30.     In the ordinary course of business, the Debtors use a cash management system to collect funds from their operations and to pay operating and administrative expenses (the "<u>Cash Management System</u>").  The Cash Management System allows the Debtors to collect and transfer efficiently the cash generated by its business and pay their financial obligations.  The Cash Management System has been in place for more than six years and is essential to the stability of the Debtors' assets and business objectives, and to maximizing the value of their estates.

DOCS_NY:42429.8

31.     As of the Petition Date, the Debtors maintain nine (9) bank accounts (the "Bank Accounts") at Silicon Valley Bank ("SVB" or the "Bank"). The Cash Management System generally consists of (i) a receivables account, into which the Debtors receive automated clearinghouse ("ACH") transfer payments from customers ("Receivables Account"); (ii) two payroll accounts, one of which is directly debited by the Debtors' payroll administrator ("Payroll Account") and one of which is inactive; (iii) an account from which the Debtors write checks to creditors who do not or cannot accept ACH or wire transfers ("Payables Account"); (iv) a collateral account securing obligations on corporate credit cards issued by SVB; (v) an operating account for Services Corp. that, except for some minimal activity related to paying down corporate credit card debt, is little used (the "Service Operating Account"); and (vi) a main operating account (the "Operating Account"). Funds are transferred from the Operating Account to fund payments from the Payroll Account, the Payables Account, and the Service Operating Account. Payments to creditors are primarily made from the Operating Account, in a variety of ways, including drafts, wire transfers, and ACH transfers.

32.     The Debtors also maintain two bank accounts at SVB (Account Nos. 2500 and 8480) whose cash balances secure a letter of credit and a corporate credit card. Account No. 2500 secures a letter of credit in the approximate amount of $350,000 in favor of the Debtors' landlord. Account No. 8480 secures the Debtors' corporate creditor with SVB (approx. $15,000).

33.     The Debtors also have a currently inactive Bank Account that had previously been dedicated to receiving and disbursing the proceeds of a PPP Loan from the federal government. The Debtors intend to dedicate this Bank Account to hold the adequate assurance deposit for utility providers.

34.     All funds on deposit in the Debtors' Bank Accounts are insured by the Federal Deposit Insurance Corporation to the extent provided by law.  SVB is on the U.S. Trustee's list of approved depository institutions.  A general diagram of the movement of funds within the Cash Management System is attached to the Cash Management Motion as <u>Exhibit B</u>.

35.     As of the Petition Date, there was approximately $42,000 in cash in the Bank Accounts (excluding certain cash collateral accounts).

36.     The Cash Management System is carefully managed through oversight procedures implemented by the Debtors' financial and accounting personnel.  Through its control over the Cash Management System and the daily reporting received in connection therewith, the Debtors' management can provide cash forecasting and reporting, monitor the collection and disbursement of funds, and maintain control of the administration of the Bank Accounts.  The Cash Management System is essential to the efficient execution and achievement of the Debtors' strategic business objectives, and, ultimately, to maximizing the value of the Debtors' estate.

37.     The Debtors are required under the terms of their proposed debtor in possession financing to open a new Bank Account with an approved depository institution to receive, hold, and disburse the proceeds of DIP financing (the "<u>DIP Funding Account</u>").

**ii.     The Bank Fees**

38.     The Debtors incur certain fees and charges in connection with the ordinary course operation of the Cash Management System (collectively, the "<u>Bank Fees</u>").  The Bank Fees include account maintenance charges, charges relating to ACH and wire transfers, lockbox and depository service charges, and other customary miscellaneous charges. On average, the Debtors incur only *de minimis* Bank Fees per month. In the ordinary course of business, the Bank

charges, and the Debtors pay, honor, or allow the deduction from the appropriate bank accounts, certain service charges, and other fees, costs, and expenses.  I do not believe there are any material prepetition Bank Fees outstanding on the Petition Date.

### iii.    The Business Forms

39.    The Debtors utilize numerous preprinted business forms in the ordinary course of its business (including, without limitation, letterhead, purchase orders, invoices, and checks), including in connection with its Cash Management System.  I am informed that the Debtors would be required by the United States Trustee (the "U.S. Trustee") under the U.S. Trustee's *Operating Guidelines for Chapter 11 Case* (the "U.S. Trustee Guidelines") to incur the expense and delay of ordering entirely new business forms referencing the Debtors' status as debtors in possession absent relief from the Court.  Utilizing the Debtors' pre-existing business forms without such a reference will minimize expense to the estate.  I submit that parties in interest will not be prejudiced if such relief is granted because parties doing business with the Debtors will likely be aware of their status as debtors in possession and, therefore, changing business forms is unnecessary and would be unduly burdensome. To the extent the Debtors exhaust their existing supply of checks, the Debtors will reorder checks with the designation "Debtor-in-Possession" and the corresponding case number.

40.    Accordingly, I believe that it is critical that the Debtors continue to utilize its existing Cash Management System without disruption and be authorized to open the DIP Funding Account and I further believe that the relief requested in the Cash Management Motion is both necessary and in the best interest of the Debtors' estates and their creditors.

**B.**      **Wage Motion**

41.      The Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) pay and/or honor and remit prepetition wages, salaries, and certain other compensation, payroll withholdings, and benefit contributions, (b) maintain employee medical and similar benefits, and (c) pay reimbursable employee expenses; and (ii) authorizing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing (the "Wage Motion").

**i.**      **The Employees**

42.      The Debtors utilize, in the aggregate, approximately 86 employees in various engineering, sales, operational, and back office and administrative positions to perform the functions necessary to efficiently and effectively operate the Debtors' business (collectively, the "Employees").[3]  All of the Employees are full time Employees, and no Employees are subject to collective bargaining agreements.

43.      The Debtors seek the relief in the Wage Motion to minimize the personal hardships that the Employees will suffer if prepetition employment-related obligations are not paid or honored, to maintain the morale of the Employees during the critical time of these Chapter 11 Cases, and to minimize disruptions to the Debtors' ongoing business operations and the administration of the estates, the Debtors.

44.      The prepetition accrued amounts that the Debtors are seeking authority to pay in the Wage Motion are summarized as follows, exclusive of any *di minimis* amounts more fully set forth in the Wage Motion:

---

[3]  All Employees are employed by debtor MobiTV.  Services Corp. has no employees.

| Wages or Benefits | Interim Amount | Final Amount |
|---|---|---|
| Wages | $40,000 | $40,000 |
| Sales Commission Obligations | $30,000 | $30,000 |
| Withholding Obligations | $100,000 | $100,000 |
| Expense Reimbursement Obligations | $2,700 | $2,700 |
| Payroll Administrators | $4,500 | $4,500 |
| FSA Plan Obligations | $45,000 | $45,000 |
| Life & Disability Insurance | $5,300 | $5,300 |
| Supplemental Workforce Obligations | $285,000 | $285,000 |
| 401(k) Plan Obligations | $1,200 | $1,200 |
| TOTAL: | $513,700 | $513,700 |

45.     For the avoidance of doubt, the Debtors request authority, but not direction, to pay such prepetition amounts on a postpetition basis, provided that no Employee will be paid a total distribution of more than the $13,650 statutory cap, except as otherwise required by applicable non-bankruptcy law.

     **ii.**     **Employee Wages, Withholding Obligations,
and Business Expense Reimbursements**

        **a.  The Employees**

46.     <u>Salaried Employees</u>. The Debtors have 76 salaried Employees who are paid current on the 15th or last day of the month, unless such day falls on a weekend or holiday, in which case, the salaried Employees are paid on the immediately preceding business day.  The last payroll was made on February 26, 2021 and included all Wages earned from February 16 through February 28, 2021.

47.     <u>Hourly Employees</u>. The Debtors have 10 hourly Employees, who, similar to the Debtors' salaried Employees, are paid in arrears on the 15th and last day of the month unless such day falls on a weekend or holiday, in which case, the hourly Employees are paid on the

immediately preceding business day.  However, the Debtors' hourly Employees are typically paid one week in arrears in order to allow the Debtors to compile, reconcile, and otherwise account for the actual time expended in a pay period by such hourly Employees. Notwithstanding the foregoing, the Debtors' last payroll for its hourly Employees was made on February 26, 2021 and included all known accrued but unpaid Wages through the end of February 2021.  Accordingly, as of the Petition Date, I estimate that there were no accrued but unpaid hourly Employee Wages.

48.     In the aggregate, the Debtors' average monthly payroll is approximately $1.45 million.  The Debtors' next semi-monthly payroll is scheduled for March 15, 2021 and will be funded by the Debtors on March 11, 2021, consistent with the payroll funding procedures discussed herein.

### b.  The Sales Commissions

49.     The Debtors pay commissions monthly to three eligible sales Employees (the "Sales Commissions") as a component of their ordinary course compensation.  The Sales Commissions are earned by the sales Employees based upon the revenue received by the Debtors on account of sales to the Debtors' customers.  On average, the Debtors incur approximately $30,000 in Sales Commissions obligations (the "Sales Commission Obligations") each month. As of the Petition Date, I estimate that there is approximately $30,000 in accrued but unpaid Sales Commission Obligations.

### c.  Employer Tax Obligations and Withholding Obligations

50.     In the ordinary course of business, the Debtors routinely withhold from Wages, and also owe in connection with Wages, certain amounts required to be transmitted to taxing authorities, including without limitation, employer payroll taxes and Employees' portions of

16

FICA and unemployment taxes (collectively, the "Payroll Tax Obligations").  The Payroll Tax Obligations are remitted by an administrator, ADP (as defined herein), as discussed below, and total approximately $500,000 per month.  In the ordinary course of business, the Debtors also withhold contributions to the Debtors' health vision, dental, and other benefit and insurance plans, 401(k) contributions and 401(k) loan repayments, employee medical contributions, flexible spending and dependent care accounts and other similar accounts, and withholdings for garnishment, or child support or similar obligations pursuant to court order or law (the "Benefit Withholdings" and, together with the Payroll Tax Obligations, the "Withholding Obligations").  I estimate that, as of the Petition Date, there are no accrued and unpaid Withholding Obligations.

### d. Employee Expense Reimbursement and Data Stipend

51.    The Debtors typically directly pay incidental business expenses in the ordinary course of business.  The Debtors also provide limited, approved business expense reimbursement to its Employees (the "Incidental Expense Reimbursement Obligations") pursuant to their internal policies and procedures, which typically average approximately $50,000 per month in the aggregate and are paid in the ordinary course of business once such expense reimbursement requests are submitted by the Employee and then reviewed and approved by the Debtors.

52.    In addition, beginning in April 2020, the Debtors began providing a stipend of $32.50 each pay period (the "Data Stipend", together with the Incidental Expense Reimbursement Obligations, the "Expense Reimbursement Obligations") to each Employee for costs incurred with respect to data and internet usage resulting from the shift of working in the office to working from home in response to the ongoing COVID-19 Pandemic.  The Debtors pay, in the aggregate, approximately $5,500 each month with respect to the Data Stipend.  I do

not believe that there are any prepetition amounts due and owing with respect to the Expense Reimbursement Obligations.

### e.  Payroll / Benefits Administration and Related Fees

53.     The Debtors employ ADP, Inc. ("ADP") as their payroll administrator to process and transfer payroll and payroll tax related amounts to the Employees and applicable authorities. As part of each payroll, the Debtors submit their payroll report to ADP two (2) days before the date that payroll is made.  Based on the report furnished by the Debtors, ADP automatically withdraws funds from the Debtors' payroll account held at Silicon Valley Bank (account number ending in 2925) *via* multiple draws beginning on the date the payroll report is submitted to ADP and continuing 3 – 4 business days thereafter.

54.     The Debtors pay ADP approximately $3,600 each month, in advance, for ADP's payroll administrative services as well as for use of ADP's "Workforce Now" online platform, which allows the Employees access to their paystubs, withholding information, and tax information.

55.     The Debtors also utilize the services of LKF Consulting LLC ("LKF Consulting," and together with ADP, the "Payroll Administrators"), which conducts the Debtors' payroll process with ADP, coordinates and addresses various payroll issues with the Debtors, and generally supports the Debtors' day-to-day payroll needs, subject to the Debtors' oversight and management. The Debtors typically pay LKF Consulting each month following the receipt of an invoice from LKF Consulting for the services provided during the previous month.  LKF's services are billed on an hourly basis and typically aggregate approximately $3,500 each month. I estimate that, as of the Petition Date, no amounts were owed to the Payroll Administrators.

### iii.    Employee Benefits and Employee Programs

### a. The Medical Plans

56.    Seventy-five (75) of the Employees (together with their participating dependents, as applicable) receive medical, dental, vision and related benefits through the Debtors. For medical coverage, Employees are offered four medical plans (two PPO plans and two HMO plans) with different deductible and premium structures administered by Sequoia (the "Medical Plans"). Premiums are paid each month by the Debtors, in advance, on a cost-sharing basis with the Employees with respect to the Medical Plans.

57.    On average, the Debtors pay Sequoia approximately $182,000 each month for premiums under the Medical Plans (inclusive of Employees' portions of premiums that is paid by the Debtors and subsequently offset by the applicable Withholding Obligations for each participating Employee). Participating Employees contribute up to 10%, or approximately $5,000 in the aggregate, of the monthly owed premiums based on which of the Medical Plans were selected by the participating Employee. I estimate that, as of the Petition Date, no amounts are owed by the Debtors on account of the Medical Plans.

### b. The Flexible Spending Account Plans

58.    Thirty two (32) of the Employees participate in certain Flexible Spending Account and related benefit plans (the "FSA Plans") offered by Navia Benefit Solutions ("Navia"). The Debtors pay approximately $350 each month and an annual fee, paid in advance, on account of the FSA Plans. The Employees contribute approximately $4,800 each month with respect to the FSA Plans. I estimate that, as of the Petition Date, approximately $45,000 is owed by the Debtors on account of the FSA Plans.

### c.  The Health Savings Plan

59.     Twenty-six (26) of the Employees participate in a Health Savings Plan (the "HSA Plan") with HSA Bank.  The Debtors pay, in advance, less than $100 per month on account of fees related to the HSA Plan and remit approximately $5,700 in Employee contributions each month to HSA Bank.  I estimate that, as of the Petition Date, no amounts are owed by the Debtors on account of the HSA Plan.

### d.  The Life & Disability Insurance

60.     The Debtors also provide Employees with life insurance and disability insurance (the "Life & Disability Insurance") through Sequoia, for which the Debtors pay approximately $5,300 in monthly premiums, in advance, at the same time it pays the premiums for the Medical Plans.  I estimate that, as of the Petition Date, no amounts are owed by the Debtors on account of the Life & Disability Insurance.

### e.  COBRA

61.     The Debtors seek to continue to perform any obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) (the "COBRA") with respect to former Employees and their covered dependents, as applicable, in the Wages Motion.  Navia is the third-party COBRA administrator for the Debtors.  The Debtors pay a *di minimis* monthly fee of approximately $50 to Navia to administer COBRA, which amount is included in monthly amounts that the Debtors pay to their benefits administrator, Sequoia. Continuing to honor any COBRA related obligations, if any, is important to maintain employee morale and ensure the orderly administration of the estates.

### f.  The Workers Compensation Program

62.    Under the laws of various states, the Debtors are required to maintain workers compensation insurance to provide their Employees with coverage of injury claims arising from or related to their employment with the Debtors.  The Debtors maintain a workers' compensation benefits program (the "WC Program") through Aon Risk Insurance Services West, Inc. ("Aon"). The WC Program provides benefits to all Employees in each of the states in which the Debtors operate for claims arising from or related to an Employee's employment with the Debtors (together with any premiums, fees, and/or other changes payable to Aon, the "WC Obligations"). Under the WC Program, Aon acts as a third party administrator and provides guaranteed insurance coverage at the statutorily-required level for the states in which the Debtors operate. The Debtors pay Aon annually, in advance, in October of each year.  As of the Petition Date, I estimate that there are no amounts due and owing on account of any prepetition WC Obligations.

### g.  401(k) Savings Plan

63.    The Debtors maintain a 401(k) plan for the benefit of their Employees (the "401(k) Plan").  The 401(k) Plan provides for automatic pre-tax and post-tax salary deductions of eligible compensation up to certain limits set by the Internal Revenue Code.  The Debtors do not pay any employer matching contributions to the 401(k) Plan.  The Debtors utilize Betterment for Business ("Betterment") as the administrator of the 401(k) Plan.  The Debtors pay Betterment an annual fee of $1,000 to administer the 401(k) Plan and $75 each quarter to send statements to the participants in the 401(k) Plan (the "401(k) Plan Obligations").  As of the Petition Date, I estimate that there is approximately $1,200 in accrued but unpaid 401(k) Plan Obligations.

### iv.    The Prepetition Employee Bonus Programs

64.    The Debtors have historically offered Employees certain annual bonuses, retention bonuses, performance bonuses, and executive bonuses (collectively, the "Bonus Programs"). The Debtors do not seek authority in the Wage Motion to continue, honor, or replace any such programs, but anticipate seeking authority with respect thereto by separate motion at a later date. For the avoidance of doubt, the Debtors will not pay any prepetition amounts with respect to the Bonus Programs without further order of the Court.

### v.    Vacation and other Paid Leave

65.    Certain of the Debtors' Employees have accrued vacation, time, sick, paid holiday and other leave policies and practices in the ordinary course of business (collectively, "Paid Time Off"). Generally, vacation time ("Vacation Time") is provided to Employees and accrual rates vary based on years of service. More specifically, Employees with less than four years' service get 15 days, or 120 hours, of Vacation Time per year, and Employees with four or more years' of service get 20 days, or 160 hours, of Vacation Time per year. Vacation Time accrues monthly and can be rolled-over year-to-year, subject to a cap of 150% of the allotted Vacation Time for the applicable Employee (the "Vacation Time Maximum Balance") pursuant to state law.

66.    Employees also receive paid sick leave ("Sick Leave"), capped at 9 days per year per Employee (together with the Vacation Time Maximum Balance, the "PTO Maximum Balance"). An Employee who reaches their applicable PTO Maximum Balance will not accrue additional Vacation Time or Sick Leave until the Employee's applicable Paid Time Off balance drops below the applicable PTO Maximum Balance, and Employees are not given any retroactive credit for any period of time in which Paid Time Off stops accruing. Employees may

not "cash out" their accrued but unused Sick Leave when their employment with the Debtors terminates, regardless of circumstances. However, departing employees are paid for accrued but unused Vacation Time, subject to the Vacation Time Maximum Balance.

67.     The Debtors also provide paid time off to all Employees in the form of absence due to illness or injury, holidays, bereavement, jury duty, and time off to vote.  Additionally, the Debtors provide eligible Employees with military leave and leave pursuant to the Family and Medical Leave Act. The Debtors also provide such additional leave as required by applicable state laws

### vi.     The Supplemental Workforce

68.     In addition to their Employees, the Debtors rely on services from a supplemental workforce ("Supplemental Workforce") comprised of (a) eight independent contractors (the "Contractors") and (b) employees provided by four third party staffing firms (the "Staffing Firms" and, such employees, the "Staffing Firm Employees").  Specifically, the Supplemental Workforce, and in particular the Contractors, provides crucial research and development, engineering, and information technology support and services.

69.     The Debtors remit fees for the services provided by the Contractors to the Contractors on a monthly basis, in arrears.  The Debtors pay the Contractors approximately $47,000 per month, in the aggregate through accounts payable.  The Debtors typically remit fees for the services provided by the Staffing Firm Employees to the Staffing Firms on a monthly basis, in advance, through accounts payable.  The Debtors pay the Staffing Firms approximately $204,000 per month.

70.     As of the Petition Date, I estimate that they owe the Contractors approximately $55,000 (the "Contractor Obligations") and owe certain of the Staffing Firms approximately

$230,000 (the "Staffing Firm Obligation," and together with the Contractor Obligation, the "Supplemental Workforce Obligations") on account of prepetition services that they seek to pay in the ordinary course of business.[4]  The Debtors believe that if the Supplemental Workforce Obligations go unpaid, the applicable Contractors and Staffing Firms may stop providing crucial services to the Debtors.  Accordingly, the Debtors request authority to pay, in their sole discretion, the Supplemental Workforce Obligations in the ordinary course of business and to continue to utilize the services of the Contractors and the Staffing Firms, in the ordinary course of business and consistent with past practice.

71.     Accordingly, I believe that the relief requested in the Wage Motion is both necessary and in the best interests of the Debtors' estates.

## C.     Utilities Motion

72.     The Debtors seek entry of interim and final orders (a) approving adequate assurance of payment for future utility services, (b) prohibiting utilities companies from altering, refusing, or discontinuing services, (c) approving procedures for resolving adequate assurance requests, and (d) granting related relief (the "Utility Motion").

73.     In connection with the operation of its business, the Debtors obtain telecommunications and internet services (collectively, the "Utility Services") from a number of utility companies (collectively, the "Utility Companies").[5]  A list of the Utility Companies that provide Utility Services to the Debtors as of the Petition Date (the "Utility Services List") is

---

[4]     The Debtors owe certain other Staffing Firms in excess of $1 million in the aggregate as of the Petition Date; however, the Debtors do not seek authority to pay such amounts by this Motion.

[5]     The Debtors' gas, water, and electricity are provided by the Debtors' landlord and included in the Debtors' monthly common area maintenance bill.  For purposes of the Utility Motion, the Debtors are not seeking to provide their landlord with an adequate assurance deposit related to these utilities.

24

attached to the Utilities Motion as <u>Exhibit A</u>.[6] The relief requested in the Utilities Motion is requested with respect to all Utility Companies providing Utility Services to the Debtors.

74.    Uninterrupted Utility Services are essential to the Debtors' ongoing business operations. The Debtors' operations rely heavily on uninterrupted telecommunications and internet services. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' ability to operate their business. Accordingly, it is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases.

75.    To the best of my knowledge, there are no defaults or arrearages on account of the Debtors' undisputed invoices for prepetition Utility Services in connection with the Debtor's active accounts. On average, the Debtors pay approximately $8,000 each month for Utility Services.

76.    The Debtors intend to pay postpetition obligations owed to the Utility Companies in a timely manner, subject to any order approving the Debtors' use of cash collateral and/or any postpetition financing facility, the documentation in respect of any such postpetition financing facility and/or use of cash collateral, and the budget governing any such postpetition financing and/or use of cash collateral. To provide additional assurance of payment, the Debtors propose to deposit into a segregated account $4,000.00 (the "<u>Adequate Assurance Deposit</u>"), which represents an amount equal to approximately one-half of the Debtor's average aggregate monthly cost of Utility Services.[7] The Adequate Assurance Deposit will be held in a segregated account for the duration of the Chapter 11 Cases. I believe that the Adequate Assurance Deposit, in

---

[6]    The inclusion of any entity on, or the omission of any entity from, the Utility Services List is not an admission by the Debtors that such entity is, or is not, a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve all rights with respect to any such determination.

[7]    Prior to the Petition Date, the Debtors transferred the Adequate Assurance deposit to a segregated bank account.

DOCS_NY:42429.8

conjunction with the Debtors' ability to pay for future utility services in accordance with prepetition practice constitutes sufficient adequate assurance to the Utility Companies.

77.     Accordingly, I believe that the relief requested in the Utilities Motion is both necessary and in the best interests of the Debtors' estates.

### D.    Customer Programs Motion

78.     The Debtors seek entry of an order (a) authorizing, but not obligating, the Debtors to maintain and administer customer-related programs as described in the motion and honor prepetition obligations to customers related thereto in the ordinary course of business and in a manner consistent with past practice in the Debtors' sole discretion, and (b) granting related relief (the "Customer Programs Motion").

79.     To solicit and retain customer business, the Debtors provide promotional discounts, service credits and adjustments, and other short-term pricing incentives ("Short Term Pricing Incentives") designed to encourage a customer's existing subscriber base to convert from cable to the Debtors' IPTV distribution service. In addition, the Debtors have negotiated pricing incentives with certain customers in exchange for prepayment of subscription fees (the "Prepayment Incentives", together with the Short Term Pricing Incentives, the "Customer Programs"). The structure of the Customer Programs varies from customer to customer, but in general, the Debtors receive an advance payment in exchange for, or to be credited against, future monthly subscription fees. As of the Petition Date, the Debtors have received approximately $315,500.00 in prepayment subscription fees that, pursuant to the Customer

Programs Motion, they seek to honor in the ordinary course of business during these Chapter 11 Cases.[8]

80.    For the reasons set forth herein and in the Customer Programs Motion, I believe that the relief requested in the Customer Programs Motion is both necessary and in the best interests of the Debtors' estates and should be granted.

**E.    <u>Critical Vendors Motion</u>**

81.    The Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay certain prepetition claims (the "<u>Critical Vendor Claims</u>") of certain critical vendors and service providers (the "<u>Critical Vendors</u>") up to $500,000 on an interim basis the ("<u>Interim Critical Vendor Cap</u>") and up to $1 million (the "<u>Final Critical Vendor Cap</u>" and, together with the Interim Critical Vendor Cap, the "<u>Critical Vendor Caps</u>"), and (b) granting related relief (the "<u>Critical Vendor Motion</u>").

82.    The Debtors' business relies on its access to and relationship with a network of vendors and suppliers, including network equipment providers, network support providers, software providers, and foreign software development providers.  If the Debtors are unable to utilize these services, their ability to operate in the ordinary course of business will be compromised and require the Debtors to implement new software solutions, which will be time consuming and disruptive.  The Critical Vendors generally provide services to the Debtors on an invoice, statement of work, or purchase order basis, and not pursuant to long-term contracts. The Debtors also rely on key service providers.  These vendors typically supply their customers with services and products on trade terms based on their experience with and perceived risk of conducting business with such customers.

---

[8]    For the avoidance of doubt, prior to the Petition Date, the Debtors received in excess of $4 million in prepayment subscription fees or like advanced payments.  However, the Debtors only seek to utilize approximately $315,500 in such prepayments during these chapter 11 cases.

83.     It is essential to the Debtors' operations that they be able to access the services of the Critical Vendors in the ordinary course of business and maintain ordinary trade terms. Failure to continue receiving services on commercially reasonable terms could have catastrophic consequences on the Debtors' finances.

84.     The Debtors undertook a process to identify the Critical Vendors using the following criteria: (i) whether a vendor is a sole-source or primary provider of services or products; (ii) whether certain customizations, specifications, or volume requirements prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe; and (iii) if a vendor is not a sole-source or primary provider of services or products, whether the Debtors can continue to operate in the ordinary course while a replacement vendor is secured.  As a result of their critical review and evaluation, the Debtors have identified a narrow subset of vendors as Critical Vendors.

85.     The Critical Vendors do not operate under formal long-term contracts with the Debtors.  Instead, the Critical Vendors rely on prompt and full payment.  Absent assurance of immediate payment either in part or in whole, the Critical Vendors could refuse to deliver goods or services to the Debtors.  I believe that it would be extremely difficult, if not impossible, to replace the Critical Vendors within a reasonable time without severe disruption to the Debtors' business.  Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims.

86.     As of the Petition Date, I estimate that the Debtors will owe amounts to certain Critical Vendors (a) that have been billed and invoiced and/or (b) that have accrued immediately prior to the Petition Date for which they have not yet been invoiced or payment is not yet due.  I anticipate the total amount of Critical Vendor Claims will be approximately $4.5 million.

87.     Given the importance of the goods or services provided by the Critical Vendors, it is imperative that the Debtors be granted, on an emergency basis, the flexibility and authority to satisfy the prepetition claims of the Critical Vendors up to the Interim Critical Vendor Cap, as any disruption in the Debtors' ability to provide support to their customers would cause immediate and irreparable damage to the Debtors' business.

88.     Subject to the Court's approval, the Debtors intend to pay the Critical Vendor Claims only to the extent necessary to preserve its business as a going concern. To that end, in return for paying the Critical Vendors Claims, the Debtors propose that they be authorized to require that the Critical Vendors provide favorable trade terms for the postpetition delivery of goods and services. Specifically, the Debtors propose to condition the payment of the Critical Vendor Claims upon the Critical Vendors' agreement to continue—or recommence—supplying goods and services to the Debtors in accordance with trade terms at least as favorable as those practices and programs (including credit limits, pricing, timing of payments, availability, and other terms) in place 12 months prior to the Petition Date, or such other trade terms that are acceptable to the Debtors in their discretion (the "Customary Trade Terms").

89.     In addition, the Debtors request in the Critical Vendor Motion that, regardless of whether a Critical Vendor enters into a Critical Vendor Agreement (as such term is defined in the Critical Vendor Motion) which is attached as Exhibit 1 to the proposed interim order granting the Critical Vendor Motion, if a Critical Vendor accepts payment pursuant to the relief requested by this Motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then: (a) the Debtors may take any and all appropriate steps to cause such Critical Vendor to repay payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such Critical Vendor; (b) upon recovery by the

Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to re-characterize and apply any payment made pursuant to the relief requested by the Critical Vendor Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

90.     Accordingly, I believe that the relief requested in the Critical Vendor Motion is both necessary and in the best interests of the Debtors' estates.

**F.     DIP Financing and Cash Collateral Motion**

91.     The Debtors have an immediate need for financing and access to Cash Collateral. Accordingly, the Debtors have filed a motion (the "DIP Motion") seeking entry of an interim order (the "Interim Order") and a final order (the "Final Order") authorizing the Debtors to borrow up to $15.5 million from the DIP Lender pursuant to a junior secured multi-draw term loan facility (the "DIP Facility") on the terms and conditions set forth in the *Debtor-in-Possession Loan and Security Agreement* annexed to the DIP Motion as Exhibit B (the "DIP Credit Agreement").

92.     On February 3, 2017, the Debtors entered into a *Loan and Security Agreement* (as amended, restated, supplemented or modified from time to time, the "Prepetition Loan Agreement") with Ally Bank (the "Prepetition Lender").  As of the Petition Date, the Debtors owed not less than $25 million in principal obligations in respect of amounts due and owing under the Prepetition Loan Agreement (the "Prepetition Indebtedness").  The Prepetition Indebtedness is secured by first priority security interests in and liens on the "Collateral" (as

defined in the Prepetition Loan Agreement) (the "Prepetition Collateral," and such security interests and liens on the Prepetition Collateral the "Prepetition Liens").

93.    As discussed above, prior to the Petition Date, the Prepetition Lender and T-Mobile executed an *Amended and Restated Junior Participation Purchase Agreement*, dated February 12, 2021, pursuant to which T-Mobile purchased a "last-out" participation in certain "Bridge Loans" extended by the Prepetition Lender to Debtors under the Prepetition Loan Documents.

94.    On February 12, 2021, the Debtors and the Prepetition Lender entered into that certain *Second Forbearance Agreement and Nineteenth Amendment to Loan and Security Agreement* (the "Nineteenth Amendment"), whereby the Prepetition Lender agreed to forbear from exercising its remedies under the Prepetition Loan Agreement until February 26, 2021.

95.    The Debtors extensively considered their financing options. With the assistance of their legal and financial advisors, the Debtors evaluated various avenues to improve the Debtors' liquidity and financial position. While the Debtors entered into advanced negotiations with several potential capital providers, including a period of exclusive negotiations with several potential investors, negotiations to structure an acceptable out-of-court refinancing were unsuccessful.

96.    The Debtors then engaged in extensive negotiations with the Prepetition Lender and the DIP Lender regarding, among other things, a potential auction sale process in the context of a chapter 11 proceeding. Ultimately, the Debtors, the DIP Lender, and the Prepetition Lender agreed that the DIP Lender would provide the Debtors with postpetition financing junior to the Prepetition Indebtedness and that the Debtors could continue to use the Prepetition Lender's Cash Collateral on the terms set forth in the Interim and Final Orders.

97.     The Debtors have concluded that the DIP Lender's proposed terms would allow the Debtors to meet their goals and provide the Debtors with sufficient liquidity on the best available economic terms.  Through the DIP Facility, the Debtors will have access to sufficient liquidity for their ordinary course operations and accruing administrative expenses pending a sale or reorganization of their affairs.  All negotiations with the DIP Lender and the Prepetition Lender were conducted at arms' length and in good faith.  The outcome of such negotiations is the DIP Credit Agreement pending before this Court.

98.     The Debtors now seek to move forward with the proposed DIP Facility on the terms set forth in the DIP Credit Agreement and Interim Order.  Subject to this Court's approval, the Debtors intend to draw on the DIP Facility in order to satisfy the Debtors' ongoing working capital needs through this restructuring process.  I believe the DIP Facility is critical to the success of the Debtors' sale and restructuring efforts.

DOCS_NY:42429.8

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 1, 2021

Terri Stevens
Chief Financial Officer