## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MOBITV, INC., *et al.*,[1]<br><br>                              Debtors. | Chapter 11<br><br>Case No. 21-10457 (___)<br><br>Joint Administration Requested |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN
SECURED POSTPETITION FINANCING; (II) AUTHORIZING THE USE
OF CASH COLLATERAL; (III) GRANTING (A) LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, AND (B) ADEQUATE PROTECTION TO
PREPETITION LENDER; (IV) MODIFYING THE AUTOMATIC STAY; (V)
SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") hereby

file this financing motion (this "Motion").  In support of this Motion, the Debtors submit the

declaration of Terri Stevens (the "First Day Declaration"), filed concurrently herewith and

incorporated herein by reference. In further support of this Motion, the Debtors respectfully

represent as follows.

### RELIEF REQUESTED

1.      The Debtors seek entry of interim and final orders, substantially in the

form of the interim order attached hereto as **Exhibit A** and a final order to be submitted at a later

date (respectively, the "Interim Order" and "Final Order"):

> a.      Authorizing the Debtors (together, in such capacity, the
> "Borrower") to obtain secured postpetition financing consisting of
> a junior secured multi-draw term loan facility (the "DIP Facility")
> in an aggregate principal amount of up to $15,500,000.00 (the
> commitments under the DIP Facility, and in no event more than

---

[1]  The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are
as follows: MobiTV, Inc. (2422) and MobiTV Service Corporation (8357). The Debtors' mailing address is 1900
Powell Street, 9th Floor, Emeryville, CA 94608.

$15,500,000.00, the "DIP Commitments," and the loans made under the DIP Facility, the "DIP Loans"), on the terms and conditions substantially in the form of the Debtor-in-Possession Loan and Security Agreement annexed hereto as **Exhibit B** (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "DIP Credit Agreement,"[2] together with any other related agreements, documents, security agreements, pledge agreements, or intercreditor agreements, collectively, the "DIP Documents"), by and among Borrower and TVN Ventures, LLC ("DIP Lender"), pursuant to which, (i) upon entry of the Interim Order and satisfaction or waiver of the other conditions set forth in the Interim Order and in the DIP Documents, the Borrower shall be authorized to make draws of DIP Loans under the DIP Commitments in the principal amount of up to $7,500,000.00 (the "Interim Loan Amount"); and (ii) upon entry of the Final Order and satisfaction or waiver of the other conditions set forth therein and in the DIP Documents, the full remaining amount of the DIP Commitments shall be available to the Borrower, subject to compliance with the terms, conditions, and covenants described in the DIP Documents;

b.  Authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable to the DIP Lender pursuant to the DIP Documents, including, without limitation, any principal, interest, fees, costs, and expenses of the respective DIP Lender (including the reasonable fees, expenses and other charges of the DIP Lenders' attorneys, advisors, accountants, and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, in each case, to the extent constituting Borrower obligations of any kind under the DIP Documents (such obligations the "DIP Obligations");

c.  Authorizing the Debtors, immediately upon entry of the Interim Order, to use proceeds of the DIP Facility (the "DIP Facility Proceeds") as expressly provided in the DIP Documents and solely in accordance with the Interim Order and the applicable Budget (the initial form of which is attached hereto as **Exhibit C**), subject to permitted variances and other exclusions set forth in the DIP Documents;

d.  Granting and approving superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1) and 507(b) of the Bankruptcy Code, to the DIP Lender in respect of all DIP Obligations, subject only to the Carve-Out and the Prepetition Adequate Protection Claims (each as defined below);

e.  Granting the DIP Lender valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined in the Interim Order at ¶ 9(a)) in all DIP Collateral (as defined in the

---

[2] Capitalized terms used but not defined herein shall have the meaning set forth in the Interim Order or the DIP Credit Agreement, as applicable.

Interim Order at ¶ F.vi.), including, without limitation, all property constituting Prepetition Collateral, including, without limitation, any Cash Collateral, to secure the DIP Obligations, which DIP Liens shall be subject only to the Prepetition Liens (as defined below) and the Carve-Out;

f.  Authorizing the Debtors to use, among other things, solely in accordance with the Budget (subject to permitted variances and other exclusions set forth in the DIP Documents) and the limitations provided in the Interim Order or Final Order, any Cash Collateral in which the Prepetition Lender (as defined below) may have an interest, and the granting of adequate protection solely to the extent of any postpetition diminution in the value of its interest in the Prepetition Collateral and Cash Collateral caused by the Debtors' postpetition use, sale, or disposition of Prepetition Collateral or Cash Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code ("Diminution in Value");

g.  Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order, Final Order and the other DIP Documents to the extent hereinafter set forth;

h.  Waiving any applicable stay (including under Bankruptcy Rules 4001(a)(3) and 6004), such that the Interim Order is immediately effective;

i.  Authorizing the Debtors to use the proceeds of the DIP Facility and Cash Collateral in accordance with the Budget, including any Permitted Variances, or as otherwise permitted by the Interim Order, the Final Order, or the DIP Credit Agreement;

j.  Scheduling a final hearing (the "Final Hearing") within thirty (30) days of the Petition Date to consider the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

k.  Granting the Debtors such other and further relief as is necessary and appropriate.

## JURISDICTION AND VENUE

2.  The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local</u> <u>Rules</u>"), the Debtors consent to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.       Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.       The statutory basis for the relief requested herein are sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 6003, 6004 and 9013 of the Federal Rules of Bankruptcy Procedures (the "<u>Bankruptcy Rules</u>"), and Local Rule 4001-2.

## BACKGROUND

5.       On the date hereof (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their business as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.   No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases (the "<u>Chapter 11 Cases</u>").

6.       The Debtors are leading providers of end-to-end internet protocol streaming television services ("<u>IPTV</u>") through which the Debtors provide a video platform and technology that streams content from leading television providers such as HBO, Fox, the Walt Disney Company, NBC, CBS, and others. The Debtors offer their IPTV services and technology to cable television operators, broadband providers, and cellular device carriers *via* its proprietary

cloud-based, fully customizable, white label application, allowing the Debtors' over 125 business customers to provide television content to over 300,000 end-user subscribers.

7.     Additional information regarding the Debtors' business and capital structure, as well as a description of the events precipitating the filing the Chapter 11 Cases, is set forth in the First Day Declaration.

**A.     Prepetition Capital Structure**

8.     On February 3, 2017, the Debtors entered into a *Loan and Security Agreement* (as amended, restated, supplemented or modified from time to time, the "Prepetition Loan Agreement", the amounts owing under the Prepetition Loan Agreement, the "Prepetition Indebtedness;" all documents evidencing and securing the Prepetition Indebtedness, the "Prepetition Loan Documents") with Ally Bank (the "Prepetition Lender").

9.     Prior to the Petition Date, the Prepetition Lender and T-Mobile, USA (the "Prepetition Participant") executed an *Amended and Restated Junior Participation Purchase Agreement*, dated February 12, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Junior Participation Agreement"), pursuant to which the Prepetition Participant purchased a "last-out" participation in certain "Bridge Loans" extended by the Prepetition Lender to Debtors under the Prepetition Loan Documents.

10.     On February 12, 2021, the Debtors and the Prepetition Lender entered into that certain *Second Forbearance Agreement and Nineteenth Amendment to Loan and Security Agreement* (the "Nineteenth Amendment"), whereby the Prepetition Lender agreed to forbear from exercising its remedies under the Prepetition Loan Agreement until February 26, 2021.

11.     As of the Petition Date, the Debtors owed not less than $25 million in principal obligations in respect of the Prepetition Indebtedness.  The Prepetition Indebtedness is secured by first priority security interests in and liens on the "Collateral" (as defined in the Prepetition Loan Agreement, and which is an all-assets collateral grant including accounts receivable, inventory, equipment, deposit accounts, general intangibles, other property, subject to certain customary exceptions) (the "Prepetition Collateral," and such security interests and liens on the Prepetition Collateral the "Prepetition Liens"), including but not limited to cash collateral.

**B.     Background to Proposed DIP Facility**

12.     As noted above, the Nineteenth Amendment expired on February 26, 2021. As a result, an "Event of Default occurred under the terms of the Prepetition Loan Documents.

13.     The Debtors extensively considered their financing options.  With the assistance of their legal and financial advisors, the Debtors evaluated various avenues to improve the Debtors' liquidity and financial position, including a structured marketing effort to secure new debt or equity capital partners to provide for a refinancing of the Prepetition Indebtedness and operating liquidity to fully bridge the Debtors' business plan to positive cash flow in 2022. The Debtors contacted seventy-nine (79) potential capital sources, ranging from strategic investors, venture capital funds, third party lenders, and media and technology focused investors, of which twenty-two (22) executed non-disclosure agreements. While the Debtors entered into advanced negotiations with several potential capital providers, including a period of exclusive

negotiations with several potential investors, negotiations to structure an acceptable out-of-court refinancing were unsuccessful.

14.    The Debtors then engaged in extensive negotiations with the Prepetition Lender and the DIP Lender regarding, among other things, a potential auction sale process in the context of a chapter 11 proceeding.  Ultimately, the Debtors, the DIP Lender, and the Prepetition Lender agreed that the DIP Lender would provide the Debtors with postpetition financing junior to the Prepetition Indebtedness.

15.    After extended arms' length and good faith negotiations, the Debtors, in an exercise of their sound business judgment, have determined that the terms of the proposed DIP Facility represent a fair and reasonable outcome for the estates and should be approved by this Court.  Notably, the DIP Facility is junior to the Prepetition Indebtedness.  Moreover, the DIP Lender is charging no commitment fees, prepayment fees, exit fees, administration fees, or unused line fees of any kind.  There is also no roll-up of Prepetition Indebtedness contemplated under the DIP Facility.

16.    The Debtors have concluded that the DIP Lender's proposed terms would allow the Debtors to meet their goals in these Chapter 11 Cases and provide the Debtors with sufficient liquidity on the best available economic terms.  Through the DIP Documents, the Debtors will have access to sufficient liquidity for their ordinary course operations and accruing administrative expenses pending a sale.  All negotiations with the DIP Lender were conducted at arms' length and in good faith.  The outcome of such negotiations is the DIP Credit Agreement pending before this Court.

17.    The Debtors now seek to move forward with the proposed DIP Facility on the terms set forth in the DIP Documents.  Subject to this Court's approval, the Debtors intend to draw on the DIP Facility in order to satisfy the Debtors' ongoing working capital needs through this restructuring process.

## C.    Summary of Essential Terms of DIP Facility

18.    In accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2(a)(i)(A), below is a summary[3] of the essential terms of the proposed financing and use of cash collateral and the location of the same in the Interim Order and/or DIP Credit Agreement:

| | |
|---|---|
| Borrowers: | MobiTV, Inc. and MobiTV Service Corporation. [DIP Credit Agreement, p. 1] |
| DIP Lender: | TVN Ventures, LLC. [DIP Credit Agreement, p. 1] |
| Type: | Junior secured multi-draw term loan. |
| Maturity Date: | May 21, 2021 unless terminated earlier in accordance with DIP Credit Agreement. [DIP Credit Agreement, ¶1.1 (Definition of Maturity Date)]  The obligation for the DIP Lender to extend further financing terminates on May 14, 2021. [*Id.* (Definition of Commitment Termination Date)] |
| Interim Loan Amount: | $7,500,000.00. |
| Final Loan Amount: | $15,500,000.00. |
| Use of DIP Loans: | Limited to paying those expenses enumerated in the Budget as and when such expenses become due and payable, subject to permitted variances. [DIP Credit Agreement ¶5.12]  The permitted variances are 20% in excess of the projected disbursements on a line-item |

---

[3]  The summaries and descriptions of the terms and conditions for the proposed financing and use of cash collateral and the provisions of the Interim Order and the Final Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof.  The summaries and descriptions are qualified in their entirety by the proposed Interim Order, the Final Order, and the DIP Documents.  In the event there is any conflict between this Motion and the Interim Order, the Final Order, or the DIP Documents, the Interim Order, the Final Order, and the DIP Documents will control in all respects.

and aggregate basis over a rolling two-week period (with testing commencing on the first Wednesday following the second Friday after the Petition Date and continuing on each Wednesday of each week thereafter); provided that all amounts budgeted to pay Professional Persons (as defined below) shall be excluded from the foregoing permitted variance and shall not be permitted any variance in excess of the Budget. [DIP Credit Agreement ¶6.18]

| | |
|---|---|
| Interest Rate: | 12.00% per annum. [DIP Credit Agreement ¶ 2.3] |
| Default Rate: | 4.00% above applicable rate. [DIP Credit Agreement ¶ 2.3] |
| Loan Fees: | None. The Debtors will have an obligation to reimburse the DIP Lender's reasonable professional fees and expenses, subject to a customary notice and review process. [Interim Order ¶3(c)] |
| Roll-Up: | None. |
| Funding Mechanics: | The proceeds of the DIP Loans when made shall be funded to a segregated debtor-in-possession account to be created in the name of MobiTV, Inc., subject to the liens and security interests solely of the DIP Lender and which shall be used for the sole purpose of holding and disbursing the proceeds of the DIP Loans (the "Funding Account"). The Debtors may, subject to conditions precedent specified in the DIP Credit Agreement, withdraw funds from the Funding Account solely to pay (x) one or more disbursements set forth as a line item in the then-effective Budget in an amount not to exceed the amount for such line item set forth in the then-effective Budget, subject to variances permitted by the DIP Agreement, (y) any amounts due and payable to the DIP Lender, or (z) to pay such other amounts that are due and payable under the DIP Documents; *provided, however,* for the avoidance of doubt, with the exception of the funds transferred into the Carve-Out Account, the Debtors (a) shall only transfer money out of the Funding Account and into its general disbursement account on a daily basis as needed to pay amounts set forth in the Budget (which shall not include funding of any minimum cash balance as set forth on the Budget) and (b) shall not be authorized to transfer funds out of the Funding Account to the extent that Cash Collateral or other funds are then available to pay such amount set forth in the Budget. [Interim Order ¶6(a)] |
| DIP Collateral/§364(c)(1): | All assets of the Debtors, excluding any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code other than any claim or cause of action to recover any amounts paid on a postpetition basis to any person or entity in violation of |

the terms of this Order, and the proceeds thereof, to the extent paid with DIP Loans and subsequently recovered from the payee pursuant to section 549 of the Bankruptcy Code or otherwise (the "Recovery Claims").  (As used in the Interim Order: all claims or causes of action arising under or pursuant to chapter 5 of the Bankruptcy Code, except the Recovery Claims, are referred to as the "Avoidance Actions;" the proceeds of Avoidance Actions are referred to as the "Avoidance Proceeds;" all the property referenced in the preceding sentence, excluding the Avoidance Actions and the Avoidance Proceeds, is collectively referred to as the "DIP Collateral;" and the property constituting the DIP Collateral, but excluding (i) the DIP Facility Proceeds in the Funding Account and the Carve-Out Account and (ii) the Recovery Claims, is referred to as the "Replacement Collateral."  [DIP Credit Agreement ¶9.1, ¶9.2 and Interim Order ¶F.v, ¶10(a)]

Priority:

The DIP Liens on the DIP Collateral securing the DIP Obligations shall be junior only to the Senior Liens (as defined below), and shall otherwise be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or security interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or other applicable law; *provided*, *however*, that the DIP Liens shall be subject to the Carve-Out (as defined below).  [Interim Order ¶10(b)]

The "Senior Liens" consist of (i) the Prepetition Liens with respect to the Prepetition Collateral (except to the extent that the Prepetition Liens are subsequently disallowed, subordinated or avoided pursuant to a final non-appealable order in favor of the plaintiff or movant in any Challenge Proceeding), (ii) the Prepetition Adequate Protection Liens with respect to the Replacement Collateral, and (iii) to any other liens that were, as of the Petition Date, valid, properly perfected, and non-avoidable. [Interim Order ¶10(a)]

DIP Superpriority Claims:

Subject only to the Carve-Out and the Prepetition Adequate Protection Claims, on account of all DIP Obligations now existing or hereafter arising pursuant to the Interim Order, the DIP Documents, or otherwise, the DIP Lender is granted an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of the Debtors (expressly excepting the Prepetition Adequate Protection Claims and claims provided for under the

Carve-Out), whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(b), 506, 507(a), 507(b), 546(c), 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim shall be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof (the "DIP Superpriority Claims"), including, upon entry of the Final Order, Avoidance Actions and Avoidance Proceeds.  [Interim Order ¶9]

| | |
|---|---|
| Adequate Protection Liens: | To the extent of any Diminution in Value, the Prepetition Lender is granted (effective and perfected upon the date of the Interim Order and without any further act and without regard to other federal, state, or local requirements or law, valid and perfected postpetition replacement security interests in and liens upon the Replacement Collateral (the "Prepetition Adequate Protection Liens"), which liens shall be, with respect to the Replacement Collateral (as defined below) (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to the Carve-Out. [Interim Order ¶8(a)(i)] |
| | The "Replacement Collateral" is the DIP Collateral, excluding the proceeds of the DIP Facility advanced to the Debtors which are deposited into a segregated account. [Interim Order ¶F.v] |
| Adequate Protection Superpriority Claim: | To the extent of any Diminution in Value, the Prepetition Lender is granted allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "Prepetition Adequate Protection Claims"), which shall be allowed claims against each of the Debtors (jointly and severally), with priority over (with the express exception of claims provided for under the Carve-Out) any and all administrative expenses and all other claims against the Debtors (including the DIP Superpriority Claims) now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 365, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code.  The Prepetition Adequate Protection Claims shall be payable from all prepetition and postpetition property of the Debtors, including |

DOCS_DE:233051.5

upon entry of the Final Order, Avoidance Actions and Avoidance Proceeds, subject to the Carve-Out.  [Interim Order ¶8(a)(ii)]

The Debtors shall also provide the Prepetition Lender with information and access to the Debtors' professionals and reimburse the Prepetition Lender's out-of-pocket fees and expenses.  [Interim Order ¶8(a)(iv, v)]

Carve-Out

i.      all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in clause (iv) below and without being subject to any budget (the "Statutory Fee Carve-Out");

ii.     all reasonable and documented fees and out-of-pocket expenses incurred by a trustee under section 726(b) of the Bankruptcy Code and allowed by the Court in an amount not to exceed $25,000 (without regard to the notice set forth in clause (iv) below) (the "Chapter 7 Trustee Carve-Out");

iii.    to the extent allowed by the Court at any time (*i.e.*, prior to or after the Carve-Out Trigger Date), whether by interim order, procedural order, or otherwise, all accrued and unpaid fees, costs, and out-of-pocket expenses, incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") and any committee pursuant to section 328 or 1103 of the Bankruptcy Code (collectively, the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons" and such fees, costs, and out-of-pocket expenses of the Professional Persons as and when allowed, the "Allowed Professional Fees"), capped at the amounts provided for such Professional Person in the Budget through the Carve-Out Trigger Date (on an aggregate basis for each such Professional Person as of such date), plus transaction fees earned by or payable to a Professional Person (including any party acting in the capacity of a broker or investment banker) (such transaction fee, the "Transaction Fees") (the amount in this section, the "Pre-Notice Professional Fee Carve-Out");

iv.     Allowed Professional Fees in an aggregate amount not to exceed $300,000 incurred on and after the Carve-Out Trigger Date (the amounts set forth in this clause (iv) being the "Post-Notice Professional Fee Carve-Out"); and

DOCS_DE:233051.5

v.     Subject to approval by the Court of a key employee retention plan and / or key employee incentive plan, which plan(s) shall be on substantially similar terms as agreed to between the DIP Lender and Debtors prior to the Petition Date (collectively, the "KEIP/KERP Plan"), all amounts in the Budget for the KEIP/KERP Plan (the "KEIP/KERP Carve-Out"). [Interim Order ¶11(a)]

The "Carve-Out Trigger Notice" means a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtors, their counsel in the Chapter 11 Cases, counsel to the Prepetition Lender, the U.S. Trustee, and counsel to the Committee, which notice (x) may be delivered only following the occurrence and during the continuation of an Event of Default under and as defined in the DIP Documents, and (y) shall state that the Post-Notice Professional Fee Carve-Out has been invoked (the day on which a Carve-Out Trigger Notice is received by the parties above, which shall be presumed to be the date which such notice is sent, the "Carve-Out Trigger Date"). [Interim Order ¶11(b)]

| | |
|---|---|
| Professional Fees Deposits | During each week after the Petition Date until Carve-Out Trigger Date occurs, the Debtors are authorized to transfer from the Funding Account into a trust account of the Debtor's restructuring counsel not subject to the control of the DIP Lender or the Prepetition Lender (the "Carve-Out Account"), an amount equal to the total fees and expenses budgeted in the Budget for all Professional Persons for such week, exclusive of any Transaction Fees included in such Budget (the "Professional Fees Deposits"). The Professional Fees Deposits shall be held in the Carve-Out Account in trust by the Debtors through their restructuring counsel for the exclusive purpose of paying amounts owed by the Debtors to such Professional Person incurred through the Carve-Out Trigger Date and allowed by the Court, and with respect to any residual amounts, the DIP Lender. The Debtors shall cause Professional Fees Deposits to be used to pay Allowed Professional Fees as they become allowed and payable pursuant to any interim or final orders of the Court.  For the avoidance of doubt, distributions of funds from the Funding Account into the Professional Fees Account shall be reported by the Debtors in their monthly operating reports. [Interim Order ¶11(d)] |
| Representations and Warranties: | Customary for financings of this type. [DIP Credit Agreement ¶4] |
| Covenants: | Customary affirmative and negative covenants for financings of this type.  [DIP Credit Agreement ¶5, ¶6] |

13

Stipulations:

The Debtors will stipulate, acknowledge, and release the Prepetition Lender with respect to the Prepetition Indebtedness and the Prepetition Liens, subject to a customary Challenge Period (as defined below) for parties in interest. [Interim Order ¶E, ¶15, ¶26] The Debtors will also release and indemnify the DIP Lender from any claims relating to the DIP Facility. [DIP Credit Agreement ¶10.3, ¶10.4; Interim Order ¶26]

The "Challenge Period" is the earlier of (y) for the Committee (so long as the Committee is appointed prior to the Final Hearing), sixty (60) days after entry of the appointment of the Committee; and (z) for all other parties in interest, seventy-five (75) days from the entry of the Interim Order. [Interim Order ¶15(a)(i)]

Events of
Default:

Customary for DIP financing, including (i) non-payment, (ii) dismissal or conversion of the Chapter 11 Cases, and (iii) failure to meet the Chapter 11 Milestones set forth below. [DIP Credit Agreement ¶ 8.1, Interim Order ¶F.v and Exh. C].

Milestone # 1.   No later than 7 days after the Petition Date, Debtors shall file the Sale Motion with the Bankruptcy Court.

Milestone # 2.   No later than 30 days after the Petition Date Debtors shall obtain the Final Order of the Bankruptcy Court and an order of the Bankruptcy Court approving bidding procedures relating to a sale motion each in form and substance satisfactory to the DIP Lender and the Prepetition Lender.

Milestone # 3.   No later than 60 days after the Petition Date, Debtors shall execute an asset purchase agreement (or agreements) which will provide sufficient estimated proceeds to repay all DIP Obligations and Prepetition Obligations in full, or such lesser amount as may be determined by the DIP Lender and the Prepetition Lender each in their sole discretion (a "Qualifying Sale Agreement").

Milestone # 4 No later than 74 days after the Petition Date, Debtors shall obtain entry of a sale order approving the Qualifying Sale Agreement.

Milestone # 5.   No later than 81 days after the Petition Date, Debtors shall close on Qualifying Sale Agreement.

Remedies:                    Immediately upon the occurrence and during the continuation of a DIP Termination Event, (a) the DIP Lender shall be permitted to, and any automatic stay whether arising under section 362 of the Bankruptcy Code or otherwise is hereby modified without further notice to hearing of or order from the Court, to the extent necessary to permit the DIP Lender to, upon the delivery of written notice (which may include electronic mail) to the Lender Remedies Notice Parties (as defined below): (i) declare all DIP Obligations owing under the DIP Documents to be immediately due and payable; (ii) terminate, reduce, or restrict any commitment to extend additional credit to the Debtors to the extent any such commitment remains; (iii) terminate the DIP Credit Agreement and any DIP Documents as to any future liability or obligation of DIP Lender thereunder, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (iv) invoke the right to charge interest at the default rate under the DIP Documents; (v) freeze monies or balances in the Funding Account (except as funds are necessary to fund the Carve-Out); (vi) notwithstanding section 553 of the Bankruptcy Code or otherwise, set off any amounts owed to the Debtors by it or any of its Affiliates (as such term is defined in section 101(2) of the Bankruptcy Code) against the DIP Obligations; and (vii) exercise any other right or remedy permitted to the DIP Lender under the DIP Credit Agreement, this Interim Order or by operation of law and (b) the Prepetition Lender shall be permitted to terminate and/or revoke the Debtors' rights, if any, under this Interim Order to use any Cash Collateral; *provided, however,* the DIP Lender or the Prepetition Lender, as applicable, may take the actions described in clauses (a) (iv) and (vii) above, with respect to the DIP Lender, or clause (b) above, with respect to the Prepetition Lender, above only after providing five (5) business days' prior written notice to counsel to the Debtors, counsel to the Prepetition Lender, counsel to any Committee, and the U.S. Trustee (the "Lender Remedies Notice Parties") of the DIP Lender's intent to exercise its rights and remedies (the "Lender Remedies Notice Period") and, during such Lender Remedies Notice Period, the Court does not order otherwise. [Interim Order ¶13]

A "DIP Termination Event" occurs upon an "Event of Default" or the "Maturity Date" under and as defined in the DIP Credit Agreement (except (x) an Event of Default which has been waived in writing by the DIP Lender or (y) an Event of Default or an occurrence of the Maturity Date with respect to which the DIP Lender has agreed, pursuant to a written agreement (a "Forbearance Agreement"), to forbear from exercising its

enforcement rights and remedies, as long as such agreement to forebear is in effect).  [Interim Order ¶12]

506(c) Waiver for
DIP Lender and
Prepetition Lender:

Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of value by DIP Lender upon the DIP Collateral or the Prepetition Lender upon the Prepetition Collateral) shall be charged against DIP Lender, any of the DIP Obligations, or the DIP Collateral, the Prepetition Lender, any of the Prepetition Obligations, or the Prepetition Collateral pursuant to section 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the DIP Lender and the Prepetition Lender, each in its sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any Budget).  [Interim Order ¶24]

**D.**    **Additional Required Disclosures**

19.    Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2(a)(i)(B) and (C), a debtor in possession seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing.  The debtor in possession must also justify the inclusion of certain such provisions.  Set forth below are the disclosures required in accordance with such rules:

a.    **Amount of Proposed Loan/Committed Amount/New Funding:**

$15,500,000.00, of which $7,500,000.00 constitutes the Interim Loan Amount.

The DIP Facility represents all new money funding.

b.    **Pricing and Economic Terms:**

Interest rate of 12% per annum.  No loan fees imposed. [DIP Credit Agreement ¶ 2.3]

16

c.  **Provisions Limiting Court's Ability to Enter Future Orders:**

None.  However, the provisions of the Interim Order and Final Order, the validity, priority, and enforceability of the DIP Liens, the DIP Superpriority Claims, the Prepetition Adequate Protection Liens, the Prepetition Adequate Protection Claims, and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in either of these Chapter 11 Cases, (b) converting either or both of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing either or both of these Chapter 11 Cases, (d) terminating the joint administration of these Chapter 11 Cases or any other act or omission, (e) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents), or (f) pursuant to which the Court abstains from hearing any of these Chapter 11 Cases. [Interim Order ¶27]

d.  **Provisions Providing for Funding of Non-Debtor Affiliates from Loan Proceeds:**

None.

e.  **Material Conditions to Closing and Borrowing:**

Closing: Customary provisions, including entry of the Interim Order.  [DIP Credit Agreement ¶3.1]

Borrowing: Compliance with Milestones (described below), compliance with TMO Master Services Agreement. [DIP Credit Agreement ¶3.2]

f.  **Carve-Out:**

The DIP Facility provides for a Carve-Out which has been defined above.  [Interim Order at ¶_11]

g.  **Postpetition Liens on Unencumbered Assets:**

The DIP Collateral includes all of the Debtors' assets, excluding Avoidance Actions and Avoidance Proceeds, other than the postpetition Recovery Claims (if any).

h.  **Plan or Sale Milestones:**

The DIP Facility requires compliance with the Chapter 11 Milestones, as set forth above.  [Interim Order, Exhibit C]

i.  **Prepayment Penalty:**

None.  The Debtors may prepay the DIP Loans at any time, in whole or in part, without premium or penalty. [DIP Credit Agreement ¶ 2.2(c)]

**j.** **Provision Causing One Jointly Administered Debtor to Become Liable for Prepetition Debt of Other Jointly Administered Debtor:**

None. Both Debtors are already liable on the Prepetition Indebtedness.

**k.** **Provision Requiring Payment of DIP Lender's Expenses and Attorney's Fees Without Notice or Review by the UST or Creditors Committee:**

None. The Interim Order incorporates a customary notice and review process. [Interim Order ¶3(c)]

**l.** **Provision Prohibiting Use of Estate Funds to Investigate Liens:**

The DIP Order permits the use of up to $50,000 of DIP Facility Proceeds by the Committee to investigate, but not litigate, any objection or challenge to, the Prepetition Liens or the Prepetition Obligations within the Challenge Period. [Interim Order ¶ 19]

**m.** **Termination or Default Provisions Concerning Use of Cash Collateral or Availability of Credit:**

The DIP Facility terminates upon the occurrence of an Event of Default under the DIP Credit Agreement or upon the Maturity Date. [Interim Order at ¶_12]

**n.** **Cross Collateralization/Elevation of Prepetition Debt Provisions:**

None, except as to the adequate protection granted to the Prepetition Lender.

**o.** **Roll-Up:**

None.

**p.** **Priming Liens:**

None.

**q.** **Provisions Binding the Estate or Other Parties with Respect to Validity, Priority or Perfection of Prepetition Liens Without Giving at Least 75 Days' Notice or Limit Court's Ability to Grant Relief in Event of Successful Challenge:**

The Challenge Period is the earlier of (y) for the Committee (so long as the Committee is appointed prior to the Final Hearing), sixty (60) days after entry of the appointment of the Committee; and (z) for all other parties in interest, seventy-five (75) days from the entry of the Interim Order. [Interim Order ¶15(a)(i)]

  **r.**  <u>**Provisions Immediately Approving All Terms and Condition of DIP Credit Agreement:**</u>

    The Interim Order at ¶ 3(a) provides that "all terms, conditions, and covenants set forth in the DIP Documents (including, without limitation, the DIP Credit Agreement) are approved."

  **s.**  <u>**Provisions That Modify or Terminate the Automatic Stay to Allow DIP Lender to Exercise Remedies Without Five (5) Days' Notice ("Remedies Period Notice"):**</u>

    The Remedies Notice Period provides for five (5) business days; advance notice. [Interim Order at ¶ 13].

  **t.**  <u>**Provisions Limiting What Parties May Raise at Emergency Hearing During Remedies Period Notice:**</u>

    None. [Interim Order at ¶ 13].

  **u.**  <u>**Provisions Granting Immediate Liens on Avoidance Actions:**</u>

    None.

  **v.**  <u>**Provisions Immediately Waiving Debtors' Rights under Section 506(c):**</u>

    The Interim Order at ¶ 24 provides for an immediate waiver of the Debtors' rights under section 506(c) as to the DIP Lender. No such rights exist anyway given that the DIP Lender is advancing new money to the estates.

  **w.**  <u>**Equities of the Case Provisions:**</u>

    None.

  **x.**  <u>**Marshalling Provisions:**</u>

    None.

**E.**  <u>**Need for Financing and Use of Cash Collateral**</u>

  20.  The Debtors have an urgent and immediate need for access to funds available under the DIP Facility and the use of the Cash Collateral. Such funding is necessary in order for the Debtors to have sufficient liquidity to operate their business and satisfy accruing administrative obligations pending the outcome of the sale process. Without immediate access to the DIP Facility and Cash Collateral, the Debtors would not be able to continue their operations

or to consummate a going concern sale, which would eliminate any possibility of maximizing the value of their estates. Accordingly, the Debtors request that the Court authorize the DIP Facility and continued use of Cash Collateral on the terms contemplated herein, initially on an interim basis and, following the Final Hearing, on a final basis.

## BASIS FOR RELIEF

**A.**   **The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code**

21.   Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

22.   In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

> a.   unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> b.   the credit transactions are necessary to preserve assets of the estate;
>
> c.   the terms of the credit agreement are fair, reasonable, and adequate;
>
> d.   the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors; and
>
> e.   the proposed financing agreement adequately protects the prepetition secured parties.

DOCS_DE:233051.5

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)).

23.    For the reasons discussed below, the Debtors satisfy the standards required to obtain postpetition financing in these cases on a junior secured superpriority basis as to the DIP Collateral under sections 364(c)(1), (2), and (3) of the Bankruptcy Code.

**B.**    **The Debtors are Unable to Obtain Financing on More Favorable Terms**

24.    As discussed above, the Debtors carefully considered their financing options.  Ultimately, the Debtors determined that the DIP Facility provides the Debtors with the best postpetition financing option available and should be approved by this Court.  Notably, the DIP Facility is junior to the Prepetition Indebtedness and the Prepetition Liens.  Moreover, the DIP Lender is charging no commitment fees, prepayment fees, exit fees, administration fees, or unused line fees of any kind.  And there is no roll-up of Prepetition Indebtedness.

25.    The Debtors respectfully submit that their efforts to obtain postpetition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code. *See, e.g., In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

**C.**    **The Proposed Financing is Necessary to Maximize the Value of the Debtors' Estates**

26.    The Debtors seek to use the proceeds of the DIP Facility for general working capital purposes in accordance with the Budget and in order to allow the Debtors to

maximize value through an orderly sale process. The DIP Facility represents the best economic alternative for a new debtor-in-possession lending arrangement.

27.     Without immediate access to the DIP Facility, the Debtors cannot continue their business operations. Stated simply, failure to access the DIP Facility would irreparably damage the Debtors' efforts to effectuate a going concern sale for the benefit of all constituents. Accordingly, the Debtors urge the Court to authorize the DIP Facility on the terms contemplated herein.

**D.      The Terms of the Proposed Financing are Fair, Reasonable, and Appropriate**

28.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

29.     The terms of the DIP Facility were negotiated in good faith and at arm's-length between the Debtors and the DIP Lender, resulting in an agreement that is designed to permit the Debtors to maximize the value of their assets. The Debtors submit that the proposed terms of the DIP Facility are fair, reasonable, and appropriate under the circumstances. *See, e.g.*, *Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo.

1997) (authorizing postpetition financing that would preserve the value of the debtor's assets). Further, the Prepetition Lender consents to the DIP Facility on the terms set forth in the Interim Order.

**E.    Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment**

30.    A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See, e.g.*, *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

31.    Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money.  *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court").  Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

DOCS_DE:233051.5

32.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious, *In re Curlew Valley Assocs.,* 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.,* 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

33.     For the reasons set forth above, the Debtors' sound business judgment clearly supports approval of the DIP Facility in order to allow the Debtors to gain access to needed financing and thereby maximize value for all constituents.

F.     **Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral**

34.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (A) each entity that has an interest in such cash collateral provides consent, or (B) the court approves the use of cash collateral after notice and a hearing.  *See* 11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

35.    Here, the Debtors seek authority to use the Cash Collateral pursuant to the Budget.  The Prepetition Lender has consented to the use of its Cash Collateral on the terms set forth in the Interim Order.

36.    Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Bankruptcy Rule 4001(b)(2).  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *see also In re Ames Dep't Stores Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).  After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

37.    As previously noted, in order to satisfy accruing administrative expenses and continue its going concern sale efforts, the Debtors require access to the DIP Facility and the use of Cash Collateral.  Such use will provide the Debtors with the necessary funds to remain administratively solvent, while allowing the Debtors to maximize value.

38.    Absent access to Cash Collateral, the Debtors would face immediate and irreparable harm.  The Debtors would be forced to convert the Chapter 11 Cases to chapter 7 and their assets would be liquidated at a fire sale value, without any realistic hope of maximizing returns.  Thus, immediate access to Cash Collateral is essential to the Debtors' ability to maximize value for the benefit of all constituents.

## G.    Interim Order and Final Hearing

39.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

40.    The urgent need to avoid immediate and irreparable harm to the Debtors' estate makes it imperative that the Debtors be authorized to access the DIP Facility and use Cash Collateral, pending the Final Hearing, in order to allow the Debtors to administer the Chapter 11 Cases and maintain their assets on a postpetition basis.  Without the ability to make draws under the DIP Facility and use Cash Collateral, the Debtors would be unable to meet their ongoing obligations and would be unable to implement the sale process, thus causing irreparable harm to the Debtors and the value of these estates.  Accordingly, the Debtors respectfully request that, pending the Final Hearing, the Interim Order be approved and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

## H.    Waiver of Bankruptcy Rule 6004(a) and 6004(h)

41.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

DOCS_DE:233051.5

## **NOTICE**

42.     The Debtors will provide notice of this Motion to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the creditors listed on the Debtors' consolidated list of thirty creditors holding the largest unsecured claims; (iii) the Internal Revenue Service; (iv) counsel to the DIP Lender; (v) counsel to the Prepetition Lender; (vi) the Office of the United States Attorney for the District of Delaware; and (vii) all parties entitled to notice pursuant to Local Rule 9013-1(m).  A copy of the Motion is also available on the Debtors' case website at https://cases.stretto.com/MobiTV.  Due to the urgency of the relief requested, the Debtors submit that no other or further notice is necessary.

## **NO PRIOR REQUEST**

43.     The Debtors have not made any prior request for the relief sought herein to this Court or any other court.

WHEREFORE, the Debtors respectfully request entry of the Interim Order and

the Final Order granting the relief requested herein and such other relief as is just and proper.


Dated:    March 1, 2021                          PACHULSKI STANG ZIEHL & JONES LLP
          Wilmington, Delaware

                                                 */s/ Mary F. Caloway*
                                                 Debra I. Grassgreen (*pro hac vice* application pending)
                                                 Jason H. Rosell (*pro hac vice* application pending)
                                                 Mary F. Caloway (DE Bar No. 3059)
                                                 919 North Market Street, 17th Floor
                                                 Wilmington, DE 19899-8705
                                                 Telephone:    302-652-4100
                                                 Facsimile:    302-652-4400
                                                 Email:        dgrassgreen@pszjlaw.com
                                                               jrosell@pszjlaw.com
                                                               mcaloway@pszjlaw.com

                                                 [Proposed] Counsel to the
                                                 Debtors and Debtors in Possession