## EXHIBIT B

**DIP Credit Agreement**

**DEBTOR-IN-POSSESSION**
**LOAN AND SECURITY AGREEMENT**

**by and among**

**MOBITV, INC.**
**MOBITV SERVICE CORPORATION**
**each as Borrower, and collectively as Borrowers,**

**and**

**TVN VENTURES, LLC**
**as Lender**

**Dated as of March 1, 2021**

---

**Up to $15,500,000 Loan**

---

## TABLE OF CONTENTS

Page

1. DEFINITIONS AND CONSTRUCTION..............................................................................1

    1.1 Definitions ...........................................................................................................1
    1.2 UCC....................................................................................................................13
    1.3 Accounting Terms .............................................................................................13
    1.4 Interpretation, etc..............................................................................................13

2. LOAN AND TERMS OF PAYMENT. ...............................................................................14

    2.1 Loan Commitments, Additional Loans and Borrowing Mechanics .................14
    2.2 Payments; Prepayments.....................................................................................14
    2.3 Interest Rates and Rates, Payments, and Calculations......................................15
    2.4 Crediting Payments; Clearance Charge ............................................................16
    2.5 Maintenance of Loan Account; Statements of Obligations ..............................16
    2.6 Payment, Maturity and Acceleration ...............................................................16
    2.7 Effect of Maturity .............................................................................................17
    2.8 Lead Borrower ..................................................................................................17
    2.9 Joint and Several Liability of Borrowers..........................................................17

3. CONDITIONS TO THE CLOSING DATE. .......................................................................18

    3.1 Conditions Precedent to the Closing Date ........................................................18
    3.2 Conditions Precedent to each Credit Extension................................................18

4. REPRESENTATIONS AND WARRANTIES. ...................................................................19

    4.1 Due Organization and Qualification..................................................................19
    4.2 Due Authorization; No Conflict........................................................................19
    4.3 Binding Obligations; Perfected Liens...............................................................20
    4.4 Title to Assets; No Encumbrances.....................................................................20
    4.5 Compliance with Laws; Permits.......................................................................20
    4.6 Fraudulent Transfer ..........................................................................................20
    4.7 Intellectual Property .........................................................................................20
    4.8 Complete Disclosure.........................................................................................20
    4.9 Intentionally Deleted. .......................................................................................21
    4.10 Payment of Taxes .............................................................................................21
    4.11 Governmental Regulation .................................................................................21
    4.12 Budget ...............................................................................................................21
    4.13 Environmental Matters .....................................................................................21

5. AFFIRMATIVE COVENANTS........................................................................................22

    5.1 Financial Statements, Reports, Certificates .....................................................22
    5.2 Other Notices....................................................................................................22
    5.3 Collateral Reporting .........................................................................................23
    5.4 Existence............................................................................................................23
    5.5 Maintenance of Properties And Intellectual Property; Permits .......................23
    5.6 Taxes .................................................................................................................23
    5.7 Inspection .........................................................................................................23

| | | | |
|---|---|---|---|
| 5.8 | Compliance with Laws | | 24 |
| 5.9 | [Reserved] | | 24 |
| 5.10 | Further Assurances | | 24 |
| 5.11 | Insurance | | 24 |
| 5.12 | Use of Proceeds | | 24 |
| 5.13 | Cash Management | | 24 |
| 5.14 | TMO Master Services Agreement. | | 24 |

6.   NEGATIVE COVENANTS. ..........24

| | | | |
|---|---|---|---|
| 6.1 | Indebtedness | | 24 |
| 6.2 | Liens | | 25 |
| 6.3 | Restrictions on Fundamental Changes | | 25 |
| 6.4 | Disposal of Assets | | 25 |
| 6.5 | Change Name | | 25 |
| 6.6 | Nature of Business | | 25 |
| 6.7 | Investments | | 25 |
| 6.8 | Payments, Prepayments and Amendments. | | 25 |
| 6.9 | Change of Control | | 26 |
| 6.10 | Restricted Junior Payment | | 26 |
| 6.11 | Accounting Methods | | 26 |
| 6.12 | Transactions with Affiliates | | 26 |
| 6.13 | Limitation on Capital Expenditures | | 26 |
| 6.14 | Sales and Lease Backs | | 26 |
| 6.15 | Bankruptcy Case | | 26 |
| 6.16 | Plan | | 26 |
| 6.17 | Subsidiaries | | 26 |

7.   [RESERVED] ..........27

8.   EVENTS OF DEFAULT. ..........27

| | | | |
|---|---|---|---|
| 8.1 | Event of Default | | 27 |
| 8.2 | Rights and Remedies | | 28 |
| 8.3 | Remedies Cumulative | | 29 |

9.   PRIORITY AND COLLATERAL SECURITY. ..........29

| | | | |
|---|---|---|---|
| 9.1 | Grant of Security Interest | | 29 |
| 9.2 | Certain Limited Exclusions. | | 29 |
| 9.3 | Collateral Security. | | 30 |
| 9.4 | No Discharge; Survival of Claims | | 30 |

10.   WAIVERS; INDEMNIFICATION. ..........30

| | | | |
|---|---|---|---|
| 10.1 | Demand; Protest; etc. | | 30 |
| 10.2 | Lender's Liability for Collateral | | 31 |
| 10.3 | Indemnification | | 31 |
| 10.4 | General Release; Covenant Not to Sue | | 31 |

11.   NOTICES. ..........32

12.   CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER. ..........33

13.    AMENDMENTS; WAIVERS; SUCCESSORS; INDEMNIFICATION. ............................................33

    13.1    Amendments and Waivers..............................................................................................33
    13.2    No Waivers; Cumulative Remedies................................................................................34
    13.3    Successors......................................................................................................................34
    13.4    Costs and Expenses; Indemnification ............................................................................34

14.    GENERAL PROVISIONS..................................................................................................34

    14.1    Effectiveness..................................................................................................................34
    14.2    Section Headings ...........................................................................................................34
    14.3    Interpretation .................................................................................................................34
    14.4    Severability of Provisions..............................................................................................34
    14.5    Non-Fiduciary Relationship ..........................................................................................35
    14.6    Counterparts; Electronic Execution ..............................................................................35
    14.7    Revival and Reinstatement of Obligations ....................................................................35
    14.8    Lender Expenses.............................................................................................................35
    14.9    Integration......................................................................................................................35

## LIST OF EXHIBITS AND SCHEDULES

Exhibit A          Form of Funding Notice

Exhibit B          Form of Interim Order

Exhibit C          Preliminary Budget

Schedule A-1       Loan Account

141858211

**DEBTOR-IN-POSSESSION**
**LOAN AND SECURITY AGREEMENT**

      **THIS DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "<u>Agreement</u>"), is entered into as of March 1, 2021, by and among **MOBITV, INC.**, a Delaware corporation ("<u>Mobi</u>"), **MOBITV SERVICE CORPORATION**, a Delaware corporation ("<u>Mobi Service</u>" and together with Mobi, each a "<u>Borrower</u>" and collectively, the "<u>Borrowers</u>") and **TVN VENTURES, LLC**, a Delaware limited liability company (together with its successors and assigns, the "<u>Lender</u>").

**RECITALS**

      WHEREAS, on March 1, 2021 (the "<u>Filing Date</u>"), the Borrowers commenced  voluntary chapter 11 case under chapter 11 of the Bankruptcy Code (collectively, the "<u>Bankruptcy Case</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

      WHEREAS, Borrowers intend to continue to operate their respective businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

      WHEREAS, Borrowers have requested that Lender provide a secured loan facility in an aggregate principal amount of up to **$15,500,000** pursuant to Section 364(c) of the Bankruptcy Code;

      WHEREAS, Borrowers are a party to that certain Loan and Security Agreement (the "<u>Senior Loan Agreement</u>"), dated as of February 3, 2017, by and among Borrowers and Ally Bank, as the lender (the "<u>Senior Lender</u>");

      WHEREAS, Lender has indicated its willingness to agree to make Loans to Borrowers, on terms and conditions set forth herein and in the other Loan Documents and in accordance with Section 364(c) of the Bankruptcy Code, so long as the Obligations are secured by Liens on the Collateral granted by each Borrower, subject in priority only to the Carve-Out and certain Permitted Senior Liens, including the Liens in favor of the Senior Lender, as hereinafter provided; and

      WHEREAS, each Borrower has agreed to provide such collateral security, subject to the approval of the Bankruptcy Court;

      NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein—provided that the Bankruptcy Court enters the Interim Order on the docket in the Bankruptcy Case within three (3) Business Days of the Filing Date, which is an express condition precedent to the effectiveness of this Agreement—the parties hereto hereby agree as follows:

**1.**      **DEFINITIONS AND CONSTRUCTION.**

      1.1    **Definitions.** Capitalized terms used in this Agreement, the terms listed in this <u>Section 1.1</u> shall have the respective meanings set forth in this <u>Section 1.1</u>.

      "<u>Account Debtor</u>" shall mean each Person who is obligated on a Receivable or any Supporting Obligation related thereto.

      "<u>Accounts</u>" means all "accounts" as defined in Article 9 of the UCC.

-1

"Additional Documents" has the meaning specified in Section 5.10.

"Adverse Proceeding" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of any Borrower) at law or in equity, or before or by any Governmental Authority, domestic or foreign, whether pending or, to the knowledge of any Borrower, threatened against or affecting any Borrower or any property of any Borrower.

"Affiliate" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person; provided, however, that the term "Affiliate" (i) as it pertains to any Borrower, shall not include Lender or any Person who controls Lender and (ii) as it pertains to Lender, shall not include any Borrower or any Subsidiary of any Borrower. For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Stock, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Bankruptcy Case" has the meaning specified in the recitals.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Bankruptcy Court" shall have the meaning set forth in the recitals.

"Borrower" and "Borrowers" each have the meaning specified in the preamble.

"Budget" shall mean the Initial Budget, as amended by any Proposed Budget Amendment approved by the Lender in writing in its sole discretion; for the avoidance of doubt, the Proposed Budget Amendment shall only be deemed to constitute the new Budget if consented to in writing by the DIP Lender, and until such time, the previously approved Budget shall be deemed to remain in place and be the Budget.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the state of Delaware.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"Cash Collateral" means "cash collateral" as that term is defined in Bankruptcy Code § 363.

"Carve-Out" has the meaning ascribed to such term in the Orders.

"Carve-Out Trigger Notice" has the meaning ascribed to such term in the Orders.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one (1) year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one (1) year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable

from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances or time deposits maturing within one (1) year from the date of acquisition thereof issued or guaranteed by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $250,000,000, having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

"Change of Control" means any sale or transfer of any equity interest in any Borrower.

"Chapter 11 Milestones" has the meaning ascribed to such term in the Orders.

"Chattel Paper" means all "chattel paper" as defined in Article 9 of the UCC, including, without limitation, "electronic chattel paper" or "tangible chattel paper", as each term is defined in Article 9 of the UCC.

"Closing Date" means the first date upon which all of the conditions set forth in Section 3.1 are satisfied.

"Collateral" has the meaning specified in Section 9.1.

"Collateral Records" means books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks and related data processing software and similar items that at any time evidence or contain information relating to any of the Borrowers or the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"Collateral Support" means all property (real or personal) assigned, hypothecated or otherwise securing any Collateral and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

"Commercial Tort Claims" means all "commercial tort claims" as defined in Article 9 of the UCC.

"Commitment Period" means the period beginning on the Closing Date and ending on the Commitment Termination Date.

"Commitment Termination Date" means the earliest to occur of (a) May 14, 2021, (b) the date that the Lender provides notice to the Borrowers that all Loan Commitments have been terminated as a result of an Event of Default under this Agreement and (c) the Maturity Date.

"<u>Committee</u>" means the official committee of unsecured creditors to be appointed by the United States Trustee in relation to the Bankruptcy Case, as applicable.

"<u>Commodities Accounts</u>" means all "commodity accounts" as defined in Article 9 of the UCC.

"<u>Credit Date</u>" means the date, which shall be a Business Day, on which any Loan is made in accordance with <u>Section 2.1</u>.

"<u>Daily Balance</u>" means, as of any date of determination and with respect to any Obligation, the amount of such Obligation owed at the end of such day.

"<u>Default</u>" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"<u>Deposit Account</u>" means any deposit account (as that term is defined in the UCC).

"<u>Documents</u>" means all "documents" as defined in Article 9 of the UCC.

"<u>Dollars</u>" or "<u>$</u>" means United States dollars.

"<u>Environmental Law</u>" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on any Borrower, relating to the environment, the effect of the environment on employee health, or hazardous materials.

"<u>Equipment</u>" means (i) all "equipment" as defined in Article 9 of the UCC, (ii) all machinery, manufacturing equipment, data processing equipment, computers, office equipment, furnishings, furniture, appliances, fixtures and tools (in each case, regardless of whether characterized as equipment under the UCC) and (iii) all accessions or additions thereto, all parts thereof, whether or not at any time of determination incorporated or installed therein or attached thereto, and all replacements therefor, wherever located, now or hereafter existing, including any fixtures.

"<u>Event of Default</u>" has the meaning specified in <u>Section 8.1</u>.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as in effect from time to time.

"<u>Facility</u>" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by any Borrower.

"<u>Filing Date</u>" has the meaning specified in the recitals.

"<u>Final Hearing</u>" means a hearing held by the Bankruptcy Court regarding the approval of the Final Order.

"<u>Final Order</u>" means a final order of the Bankruptcy Court authorizing and approving this Agreement and the other Loan Documents on a final basis and entered following a final hearing in form and substance satisfactory to Lender.

"<u>Funding Notice</u>" means a notice substantially in the form of <u>Exhibit A</u> hereto, executed by Responsible Officer of the Lead Borrower.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"General Intangibles" (i) means all "general intangibles" as defined in Article 9 of the UCC, including "payment intangibles" also as defined in Article 9 of the UCC and (ii) includes, without limitation, all interest rate or currency protection or hedging arrangements, all tax refunds, all licenses, permits, concessions and authorizations, all Material Contracts and all Intellectual Property (in each case, regardless of whether characterized as general intangibles under the UCC).

"Goods" (i) means all "goods" as defined in Article 9 of the UCC and (ii) includes all Inventory and Equipment (in each case, regardless of whether characterized as goods under the UCC).

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Highest Lawful Rate" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"Indebtedness" means (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all capital lease obligations, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person, (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off-balance sheet financing products, or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, indorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning specified in Section 10.3.

"Indemnified Person" has the meaning specified in Section 10.3.

"Initial Budget" shall mean a budget for the 11-week period beginning on the Filing Date, reflecting projected cash receipts, operating disbursements, non-operating disbursements, professional fees and the then-current amount of the Loans outstanding on a weekly basis, in form and substance reasonably acceptable to the Lender, attached in a preliminary form hereto as Exhibit C, and to be attached in its final form to the Interim Order upon its entry in the Bankruptcy Case.

"Insolvency Proceeding" means a proceeding under the Bankruptcy Code, an assignment for the benefit of credits, the appointment of a receiver, or any similar proceeding.

"Instruments" means all "instruments" as defined in Article 9 of the UCC.

"Insurance" means (i) all insurance policies covering any or all of the Collateral (regardless of whether the Lender is the loss payee thereof) and (ii) any key man life insurance policies.

"Intellectual Property" means (a) all present and future trade secrets, know-how and other proprietary information, (b) trademarks, trademark applications, internet domain names, service marks, service mark applications, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing), indicia and other source and/or business identifiers, and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world, (c) copyrights and copyright applications (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, (d) unpatented inventions (whether or not patentable), patents and patent applications, (e) industrial design applications and registered industrial designs, (f) license agreements related to any of the foregoing and income therefrom, books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing, (g) the right to sue for all past, present and future infringements of any of the foregoing, (h) all other intellectual property, and (i) all common law and other rights throughout the world in and to all of the foregoing.

"Interim Order" means the proposed interim order attached hereto as Exhibit B (with only such modifications as are acceptable to Lender), the entry of which by the Bankruptcy Court on the docket in the Bankruptcy Case is an express condition precedent to the effectiveness of this Agreement.

"Inventory" means (i) all "inventory" as defined in Article 9 of the UCC and (ii) all goods held for sale or lease or to be furnished under contracts of service or so leased or furnished, all raw materials, work in process, finished goods, and materials used or consumed in the manufacture, packing, shipping, advertising, selling, leasing, furnishing or production of such inventory or otherwise used or consumed in the Borrowers' business; all goods in which any Borrower has an interest in mass or a joint or other interest or right of any kind; and all goods which are returned to or repossessed by any Borrower, all computer programs embedded in any goods and all accessions thereto and products thereof (in each case, regardless of whether characterized as inventory under the UCC).

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) *bona fide* Accounts arising in the ordinary course of business), or acquisitions of Indebtedness, Stock, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"Investment Related Property" means (i) all "investment property" (as such term is defined in Article 9 of the UCC) and (ii) all of the following (regardless of whether classified as investment property under the UCC): any Deposit Account, Securities Account or Commodities Account of the Borrowers and certificates of deposit.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

-6-

"Lead Borrower" means Mobi.

"Lender" has the meaning set forth in the preamble.

"Lender Expenses" means all (a) costs or expenses required to be paid by any Borrower under any of the Loan Documents that are paid, advanced, or incurred by Lender, (b) out-of-pocket fees or charges paid or incurred by Lender in connection with its transactions with the Borrowers under any of the Loan Documents, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations to the extent of the fees and charges (and up to the amount of any limitation) contained in the Agreement), real estate surveys, real estate title policies and endorsements, and environmental audits, (c) reasonable out-of-pocket costs and expenses incurred by Lender in the disbursement of funds to Borrowers (by wire transfer or otherwise), (d) out-of-pocket charges paid or incurred by Lender resulting from the dishonor of checks payable by or to any Borrower, (e) reasonable out-of-pocket costs and expenses paid or incurred by Lender to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) reasonable out-of-pocket audit fees and expenses (including reasonable travel, meals, and lodging) of Lender related to any inspections or audits to the extent of the fees and charges (and up to the amount of any limitation) contained in the Agreement, (g) reasonable out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or Lender's relationship with the Borrowers, (h) Lender's reasonable costs and expenses (including reasonable attorneys' fees) incurred in advising, structuring, drafting, reviewing, administering (including reasonable travel, meals, and lodging), or amending the Loan Documents, (i) Lender's reasonable costs for the maintenance and preservation of the Collateral to the extent the Borrowers fail to do so and (j) Lender's reasonable costs and expenses (including reasonable attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including reasonable attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning the Borrowers or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any remedial action concerning the Collateral.

"Lender-Related Person" means Lender and Lender's Subsidiaries and other Affiliates and their respective partners, shareholders, directors, managers, officers, employees, agents, advisors, representatives, heirs, successors and assigns, when acting in a representative or official capacity on behalf of Lender.

"Lender's Liens" means the Liens granted by any Borrower or any of their respective Subsidiaries to Lender under the Loan Documents.

"Letter of Credit Right" means "letter-of-credit right" as defined in Article 9 of the UCC.

"Lien" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional

sale contract or other title retention agreement, the interest of a lessor under a capital lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Loan(s)" means a loan or loans, as the case may be, made to the Borrowers by the Lender pursuant to Section 2.1.

"Loan Account" means an account maintained hereunder by the Lender on its books of account, in which the Borrowers will be charged with all Obligations incurred by the Borrowers and to which payments shall be made in accordance with the wiring instructions set forth on Schedule A-1.

"Loan Commitment" means $**15,500,000.00**, the maximum principal amount of Lender's obligation to make Loans to Borrowers pursuant to Section 2. For the avoidance of doubt, the Loan Commitment shall be reduced by the amount of all Loans that are funded.

"Loan Documents" means the Agreement, the Orders and any note or notes executed by any Borrower in connection with this Agreement and payable to Lender, any other agreement entered into, now or in the future, by any Borrower and Lender in connection with this Agreement, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing.

"Material Adverse Change" means (a) except as a result of the commencement of the Bankruptcy Case, a material adverse change in the business, operations, results of operations, assets, liabilities or financial condition of the Borrowers, taken as a whole, (b) a material impairment of the Borrowers' ability to perform its obligations under the Loan Documents to which it is a party or of Lender's ability to enforce the Obligations or realize upon the Collateral, (c) a material impairment of the enforceability or priority of Lender's Liens with respect to any material portion of the Collateral as a result of an action or failure to act on the part of any Borrower, or (d) any interruption or material degradation of service to the end customers served under the TMO Master Services Agreement.

"Material Contract" means (i) the TMO Master Services Agreement and (ii) each other contract or agreement to which any Borrower is a party for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to result in a Material Adverse Change.

"Maturity Date" means the earliest to occur of (a) May 21, 2021, (b) the date on which the principal amount of all outstanding Obligations have been declared or automatically have become due and payable (whether by acceleration pursuant to Section 8.2 hereof upon the occurrence of an Event of Default or otherwise) and (c) the date upon which any Event of Default described in Section 8.1(g) or (i) first occurs.

"Money" means "money" as defined in the UCC.

"Moody's" has the meaning specified in the definition of Cash Equivalents.

"Obligations" means the Loans and all loans, debts, principal, interest, contingent reimbursement or indemnification obligations, premiums, liabilities (including all amounts charged to the Loan Account pursuant to the Agreement), obligations (including indemnification obligations), fees, Lender Expenses, guaranties, covenants, and duties of any kind and description owing by any Borrower to Lender pursuant to or evidenced by the Loan Documents, irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that any Borrower is required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents.

"Orders" means the Interim Order, until the Bankruptcy Court enters the Final Order, upon which occurrence, it shall mean then either or both the Interim Order and the Final Order as the context may require.

"Organizational Documents" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation, (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or organization and all applicable resolutions of any managing member or board of managers or other governing body of such limited liability company, and (d) any agreement between any Borrower and its shareholders, members, partners or its equity owners, or among any of the foregoing.

"Permits" means any license, lease, power, permit, franchise, certificate, authorization or approval issued by a Governmental Authority.

"Permitted Dispositions" means:

(a)     sales, abandonment, or other dispositions of Equipment that is substantially worn, damaged, or obsolete in the ordinary course of business, provided that the proceeds thereof are used either to replace such Equipment with Equipment of equal or greater value or are applied to the repayment of the Loans or the repayment of obligations to the Senior Lender,

(b)     any involuntary loss, damage or destruction of property,

(c)     any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property,

(d)     the making of a Permitted Investment, and

(e)     dispositions expressly set forth in the Budget.

"Permitted Indebtedness" means:

(a)     Indebtedness evidenced by this Agreement and the other Loan Documents,

(b)     Indebtedness in existence on the Filing Date of one or more of the Borrowers (and refinancings or amendments thereof to the extent permitted by the Bankruptcy Court), including, for the avoidance of doubt, the obligations owing in favor of the Senior Lender,

(c)     Indebtedness incurred in the ordinary course of business during the Bankruptcy Case under performance, surety, statutory, and appeal bonds,

(d)     indorsement of items for deposit or collection in the ordinary course of business,

(e)     Indebtedness representing deferred compensation to directors, officers, members of management, employees or consultants of any Borrower, in the ordinary course of business,

(f)    contingent obligations in respect of indemnities or similar agreements to hold others harmless arising in the ordinary course of business,

(g)    Indebtedness owed to any Person providing property, casualty, liability, or other insurance to any Borrower, in an amount not to exceed $25,000 at any time outstanding incurred in the ordinary course of business under financing arrangements related to the payment of premiums and deductibles under insurance policies so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of such insurance (exclusive of interest, fees and other charges incurred in connection with premium financing), and shall be incurred only to defer the cost of, such insurance for a period not to exceed one year and shall be payable in full not later than the end of such one year period, and

(h)    Permitted Investments to the extent constituting Indebtedness.

"Permitted Investments" means:

(a)    Investments in cash and Cash Equivalents,

(b)    advances made in connection with purchases of goods or services in the ordinary course of business,

(c)    Investments received in settlement of amounts due to any Borrower effected in the ordinary course of business or owing to any Borrower as a result of insolvency proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of any Borrower,

(d)    guarantees permitted under the definition of Permitted Indebtedness,

(e)    Stock or other securities acquired in connection with the satisfaction or enforcement of Indebtedness or claims due or owing to any Borrower (in bankruptcy of customers or suppliers or otherwise outside the ordinary course of business) or as security for any such Indebtedness or claims, and

(f)    deposits of cash made in the ordinary course of business to secure performance of operating leases.

"Permitted Liens" means:

(a)    the Liens in favor of the Lender under the Loan Documents,

(b)    Liens on the Collateral existing on the Closing Date (including, for the avoidance of doubt, the Permitted Senior Liens),

(c)    deposits or pledges of cash to secure obligations under workmen's compensation, social security or similar laws, or under unemployment insurance pertaining to any Borrower's employees,

(d)    deposits or pledges of cash to secure bids, tenders, contracts (other than contracts for the payment of money or the deferred purchase price of property or services), leases, statutory obligations, surety and appeal bonds or other obligations of like nature arising in the ordinary course of business of any Borrower, and

(e)    Liens for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or that are the subject of a Permitted Protest.

"Permitted Protest" means the right of any Borrower to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on any Borrowers' books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Borrower, as applicable, in good faith, and (c) Lender is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lender's Liens.

"Permitted Senior Liens" means the Liens granted to the Senior Lender pursuant to the Senior Loan Documents.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Plan of Reorganization" means a chapter 11 plan for the Borrowers, that provides for, inter alia, payment in full in cash of all Obligations on the effective date thereof, together with releases, exculpations, waivers and indemnification, reasonably acceptable to Lender.

"Proceeds" means (i) all "proceeds" as defined in Article 9 of the UCC, (ii) payments or distributions made with respect to any Investment Related Property and (iii) whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

"Professional Persons" shall have the meaning ascribed to such term in the Orders.

"Proposed Budget Amendment" shall mean a budget, in form and substance reasonably acceptable to the Lender, for the 11-week period beginning on the Filing Date reflecting—for past weeks, actual, and for future weeks, projected—cash receipts, operating disbursements, non-operating disbursements, professional fees, and the then-current amount of the Loans outstanding on a weekly basis.

"Receivables" means all rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, including, without limitation all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General Intangible or Investment Related Property, together with all of any Borrower's rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Receivables Records.

"Receivables Records" means (i) all original copies of all documents, instruments or other writings or electronic records or other Records evidencing the Receivables, (ii) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices, and other papers relating to Receivables, including, without limitation, all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to the Receivables, whether in the possession or under the control of any Borrower or any computer bureau or agent from time to time acting for any Borrower or otherwise, (iii) all evidences of the filing of financing statements and the registration of other instruments in connection therewith, and amendments, supplements or other modifications thereto, notices to other creditors or secured parties, and certificates, acknowledgments, or other writings,

including, without limitation, lien search reports, from filing or other registration officers, (iv) all credit information, reports and memoranda relating thereto and (v) all other written or nonwritten forms of information related in any way to the foregoing or any Receivable.

"Record" shall have the meaning specified in Article 9 of the UCC.

"Responsible Officer" means, with respect to any Person, any individual holding the position of, chief executive officer, chief restructuring officer or chief financial officer.

"Restricted Junior Payment" means to (a) declare or pay any dividend or make any other payment or distribution on account of Stock issued by any Borrower (including any payment in connection with any merger or consolidation involving any Borrower) or to the direct or indirect holders of Stock issued by any Borrower in its capacity as such, (b) purchase, redeem, or otherwise acquire or retire for value (including in connection with any merger or consolidation involving any Borrower) any Stock issued by any Borrower, (c) declare, pay or agree to pay any management, advisory or similar fees or expenses.

"Schedules" means those certain schedules annexed to this Agreement and made a part hereof.

"S&P" has the meaning specified in the definition of Cash Equivalents.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Securities" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"Securities Accounts" means all "securities accounts" as defined in Article 8 of the UCC.

"Security Instruments" means all UCC financing statements filed in connection with the Loan Documents.

"Senior Lender" has the meaning set forth in the recitals.

"Senior Loan Agreement" has the meaning set forth in the recitals.

"Senior Loan Documents" means the Senior Loan Agreement and any and all notes, security instruments or other documents executed from time to time in connection with the Senior Loan Agreement.

"Stock" means all shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the shares of Stock having ordinary voting power to elect a majority of the board of directors (or appoint other comparable managers or governing body) of such corporation, partnership, limited liability company, or other entity.

"Supporting Obligation" means all "supporting obligations" as defined in Article 9 of the UCC.

"TMO Master Services Agreement" that certain Master Agreement dated as of November 6, 2019 between Lender and Mobi, as amended from time to time (and together with all statement of work contracts, as applicable).

"UCC" means the Delaware Uniform Commercial Code, as in effect from time to time.

"United States" means the United States of America.

"Variance Report" means a detailed reconciliation analysis and report, in a form and substance acceptable to Lender, certified in writing by the Lead Borrower as being true and accurate in all material respects, and which, at a minimum, shows with reference to each Budget line-item: (x) Borrowers' actual cash receipts and disbursements for the preceding seven (7) day period of Monday through Sunday ending immediately prior to the Wednesday when each such report is due, (y) Borrowers' compliance or noncompliance with Section 6.18; and (z) the cumulative unused amount budgeted for the Budget line item that Borrowers propose to carry forward to successive weekly budget periods with respect to such Budget line item.

"Voidable Transfer" has the meaning specified in Section 14.7.

1.2    **UCC.** Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, however, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

1.3    **Accounting Terms.** Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by Borrowers to Lender pursuant to Section 5.1(a) shall be prepared in accordance with GAAP as in effect at the time of such preparation. To the extent there are any changes in GAAP from the date of this Agreement, if at any time such change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and Borrowers or Lender shall so request, Lender and Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; provided that, until so amended, such ratio or requirement shall continue to be computed in accordance with GAAP as in effect immediately prior to such change therein.

1.4    **Interpretation, etc.**

(a)    Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.

(b)    References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.

(c)    The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not no limiting language (such as "without limitation" or "but not limited to" or words of similar import) is

used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

(d)     The word "will" shall be construed to have the same meaning and effect as the word "shall".

(e)     Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as it was originally executed or as it may from time to time be amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (iii) the words "hereof", "herein" and "hereunder" and words of similar import shall be construed to refer to this Agreement as a whole and not to any particular provision hereof, (iv) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(f)     Unless otherwise expressly stated, all time references herein shall be to Eastern Time.

## 2.     LOAN AND TERMS OF PAYMENT.

2.1     **Loan Commitments, Additional Loans and Borrowing Mechanics.**

(a)     **Loan Commitment**. During the Commitment Period, subject to the terms and conditions and in reliance on the representations and warranties of the Borrowers set forth herein, the Lender agrees to make Loans to the Borrowers in amounts such that the aggregate amount of the Loans made shall not exceed the Loan Commitment in effect from time to time. Such Loan amounts shall accrue interest thereon from the date such additional principal amounts are funded.  Amounts borrowed pursuant to this Section 2.1 may not be repaid and reborrowed during the Commitment Period.

(b)     **Borrowing Mechanics**.  Whenever Borrowers desire that Lender make a Loan, Borrowers shall deliver to Lender a Funding Notice no later than 11:00 a.m. prevailing eastern time at least two (2) Business Days in advance of the proposed Credit Date specifying the amount of such requested Loan and the proposed Credit Date, executed by a Responsible Officer of each Borrower.  The amount of such Loan requested shall not exceed the lesser of (i) the Loan Commitment then in effect minus the principal amount of all Loans made prior to the making of the requested Loan and (ii) the aggregate principal amount of Loans anticipated to be needed for the week that includes the proposed Credit Date, as set forth in the Budget, less the principal amount of Loans previously made during such week.

2.2     **Payments; Prepayments.**

(a)     **Payments by Borrower**. Except as otherwise expressly provided herein, all payments by Borrowers shall be made to the Loan Account for the account of Lender and shall be made in immediately available funds, no later than 4:00 p.m. prevailing eastern time on the date specified herein. Any payment received by Lender later than 4:00 p.m. prevailing eastern time shall be deemed to have been received on the following Business Day and any applicable interest or fees shall continue to accrue until such following Business Day.

(b)    **Apportionment and Application**. All payments remitted to Lender and all proceeds of Collateral received by Lender shall be applied as follows (unless otherwise directed by Lender):

(i)    <u>first</u>, to pay any Lender Expenses (including cost or expense reimbursements) in accordance with the Orders or indemnities then due to Lender under the Loan Documents, until paid in full,

(ii)    <u>second</u>, to pay accrued interest due in respect of the Loans until paid in full,

(iii)    <u>third</u>, to pay the principal of the Loans until paid in full,

(iv)    <u>fourth</u>, to pay any other Obligations until paid in full, and

(v)    <u>fifth</u>, to Borrowers or as otherwise required by applicable law.

In the event of a direct conflict between the priority provisions of this <u>Section 2.2</u> and any other provision contained in any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 2.2</u> shall control and govern; provided, however, that in the event of any actual, irreconcilable conflict between the terms and provisions contained in the Orders and the terms and provisions contained in any other Loan Document, the terms and provisions of the Orders shall control and govern.

(c)    **Optional Prepayments.** Borrowers may prepay the outstanding principal amount of the Loans at any time in whole or in part, without premium or penalty.

(d)    **Overadvances**. Borrowers shall from time to time prepay the Loans to the extent necessary so that the aggregate outstanding principal amount of the Loans shall not at any time exceed the Loan Commitment.

2.3    <u>**Interest Rates and Rates, Payments, and Calculations.**</u>

(a)    **Interest Rate.** All Obligations shall bear interest on the Daily Balance thereof at a fixed rate equal to **12%** per annum; <u>provided</u> that, for the avoidance of doubt, the foregoing rate shall be subject to the limitations set forth in paragraph (e) below.

(b)    **Default Rate.** Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to four percentage points (4%) above the per annum rate otherwise applicable hereunder without any notice from Lender or any other Person; <u>provided</u> that, for the avoidance of doubt, the increased rate on account of this paragraph (b) shall be subject to the limitations set forth in paragraph (e) below.

(c)    **Payment.** All accrued interest shall be due and payable on the Maturity Date.

(d)    **Computation**. All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 365 day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(e)    **Usury Savings Clause**. Notwithstanding any other provision herein, the aggregate interest rate charged or agreed to be paid with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrowers shall pay to Lender an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lender and Borrowers to conform strictly to any applicable usury laws. Accordingly, if Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Borrowers. In determining whether the interest contracted for, charged, or received by Lender exceeds the Highest Lawful Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Obligations hereunder.

2.4    **Crediting Payments; Clearance Charge.** The receipt of any payment item by Lender shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Loan Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Lender only if it is received into the Loan Account on a Business Day on or before 4:00 p.m prevailing eastern time. If any payment item is received into the Loan Account on a non-Business Day or after 4:00 p.m. prevailing eastern time on a Business Day, it shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.

2.5    **Maintenance of Loan Account; Statements of Obligations.** Lender shall maintain the Loan Account on its books in the name of Borrowers on which Borrowers will be charged with the Loans and with all other payment Obligations hereunder or under the other Loan Documents including accrued interest, fees and expenses, and Lender Expenses. In accordance with <u>Section 2.4</u>, the Loan Account will be credited with all payments received by Lender from Borrowers or for Borrowers' account. Lender shall render monthly statements regarding the Loan Account to Borrowers, including principal, interest, fees, and including an itemization of all charges and expenses constituting Lender Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and Lender.

2.6    **Payment, Maturity and Acceleration.**

(a)    All Obligations, including without limitation the outstanding unpaid principal balance, all accrued and unpaid interest on the Loans and all Lender Expenses shall be due and payable on the Maturity Date.

(b)    The foregoing notwithstanding and subject to the terms of the Orders, Lender Expenses and all fees payable hereunder or under any of the other Loan Documents shall be due and payable, in arrears, on the first day of each month at any time that Obligations are outstanding. Borrowers hereby authorize Lender, from time to time without prior notice to Borrowers, to charge all fees payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), all costs, expenses, and Lender Expenses payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), and all other payments as and when due and payable under any Loan Document to the Loan Account, which amounts thereafter shall constitute Obligations hereunder and shall accrue interest at the rate then applicable to the Loans. Any fees, costs, expenses, Lender Expenses, or other amounts payable hereunder or under any other Loan Document not paid when due shall be compounded by being charged to the Loan Account and shall thereafter constitute Obligations hereunder and shall accrue interest at the rate then applicable to the Loans in accordance with the terms of this Agreement.

2.7    **Effect of Maturity.** On the Maturity Date, all Obligations immediately shall become due and payable without notice or demand. No termination of the obligations of Lender (other than payment in full of the Obligations) shall relieve or discharge Borrowers of their duties, Obligations, or covenants hereunder or under any other Loan Document and Lender's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full. When all of the Obligations have been paid in full in cash, Lender will, at Borrowers' sole expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Lender's Liens and all notices of security interests and liens previously filed by Lender with respect to the Obligations.

2.8    **Lead Borrower.** Each Borrower hereby designates the Lead Borrower as its representative and agent for all purposes under the Loan Documents, including requests for Loans, delivery or receipt of communications, preparation and delivery of financial reports, receipt and payment of Obligations, requests for waivers, amendments or other accommodations, actions under the Loan Documents (including in respect of compliance with covenants), and all other dealings with the Lender. The Lead Borrower hereby accepts such appointment. The Lender shall be entitled to rely upon, and shall be fully protected in relying upon, any notice or communication (including any Funding Notice) delivered by the Lead Borrower on behalf of any other Borrower. The Lender may give any notice or communication with a Borrower hereunder to the Lead Borrower on behalf of such Borrower. Each Borrower agrees that any notice, election, communication, representation, agreement or undertaking made on its behalf by the Lead Borrower shall be binding upon and enforceable against it.

2.9    **Joint and Several Liability of Borrowers** Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrower, with respect to the payment and performance of all of the Obligations, it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them. If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrower will make such payment with respect to, or perform, such Obligation until such time as all of the Obligations are paid in full.

## 3.    CONDITIONS TO THE CLOSING DATE.

3.1    **Conditions Precedent to the Closing Date.**

The obligation of the Lender to make the Loan on the Closing Date is subject to the satisfaction of the following conditions in a manner satisfactory to the Lender:

(a)    This Agreement and all Loan Documents (including, for the avoidance of doubt, intellectual property security agreements) and any other documents to be delivered in connection with the transactions contemplated by this Agreement shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to Lender.

(b)    The representations and warranties of the Borrowers contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the Closing Date.

(c)    Lender shall have received evidence, in form and substance satisfactory to Lender that each Borrower shall have obtained all requisite consents and approvals in connection with the filing of the Bankruptcy Case and the execution, delivery and performance of this Agreement and the other Loan Documents.

(d)    Borrowers shall have filed their Bankruptcy Case in the Bankruptcy Court and each Borrower shall be a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code.

(e)    The Bankruptcy Court shall have entered the Interim Order, in form and substance satisfactory to Lender, and such order shall be in full force and effect and shall not have been modified or amended (unless otherwise approved by Lender), reversed or stayed. The Borrowers and Lender shall be entitled to rely in good faith upon the Interim Order, and shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections thereto, unless the relevant order has been stayed by a court of competent jurisdiction.

(f)    All first day motions and applications shall have been filed, and all orders with respect thereto and any other orders entered in the Bankruptcy Case prior to the Closing Date shall be in form and substance satisfactory to Lender.

(g)    Lender shall have received the Initial Budget, in form and substance satisfactory to Lender.

(h)    [reserved].

3.2    **Conditions Precedent to each Credit Extension.**

The obligation of the Lender to make a Loan on any Credit Date, including the Closing Date, are subject to the satisfaction, or waiver in accordance with Section 13, of each of the following conditions precedent:

(a)    Lender shall have received a fully executed and delivered Funding Notice.

(b)     Borrowers shall have complied fully and completely with all then applicable Chapter 11 Milestones set forth in the Orders unless otherwise waived or consented to in writing by Lender.

(c)     The amount of such Loan requested through the Funding Notice does not exceed the lesser of (i) the Loan Commitment then in effect minus the principal amount of all Loans made prior to the making of the requested Loan and (ii) the aggregate principal amount of Loans anticipated to be needed for the week that includes the proposed Credit Date, as set forth in the Budget, less the principal amount of Loans previously made during such week.

(d)     The representations and warranties of the Borrowers contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(e)     No Default or Event of Default shall have occurred and be continuing or shall result from the making of the Loan contemplated hereby.

(f)     The Borrowers shall be performing under and in compliance in all material respects with the TMO Master Services Agreement.

## 4.     REPRESENTATIONS AND WARRANTIES.

In order to induce Lender to enter into this Agreement, each Borrower makes the following representations and warranties to Lender as of the Closing Date, and as of each Credit Date, and such representations and warranties shall survive the execution and delivery of this Agreement:

4.1     **Due Organization and Qualification.** Each Borrower (i) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, (ii) is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, and (iii) subject to any limitation under applicable bankruptcy law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted and, upon the entry by the Bankruptcy Court of the Orders, to enter into the Loan Documents and to carry out the transactions contemplated thereby.

4.2     **Due Authorization; No Conflict.**

Subject to the Bankruptcy Court's entry of the Orders:

(a)     The execution, delivery, and performance by each Borrower of the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Borrower.

(b)     The execution, delivery, and performance by each Borrower of the Loan Documents to which it is a party do not and will not (i) violate any material provision of federal, state, or local law or regulation applicable to such Borrower, the Organizational Documents of such Borrower, or any order, judgment, or decree of any court or other Governmental Authority binding on such Borrower, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract of any Borrower except to the extent that any such conflict, breach or default

-19-

could not individually or in the aggregate reasonably be expected to result in a Material Adverse Change, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any Collateral of any Borrower, other than liens in favor of Lender, or (iv) require any approval of any Borrower's interest holders or any approval or consent of any Person under any Material Contract of any Borrower, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of Material Contracts, for consents or approvals, which the failure to obtain could not individually or in the aggregate reasonably be expected to result in a Material Adverse Change.

4.3    **Binding Obligations; Perfected Liens.** Subject to the Bankruptcy Court's entry of the Orders, each Loan Document has been duly executed and delivered by each Borrower and is the legally valid and binding obligation of each Borrower, enforceable against such Borrower in accordance with its respective terms.   Lender's Liens are validly created and perfected in first priority subject only to Permitted Senior Liens.

4.4    **Title to Assets; No Encumbrances.** Each Borrower has (i) valid leasehold interests in (in the case of leasehold interests in real property), and (iii) good title to (in the case of all personal property), all of its properties and assets. Except as permitted by this Agreement (including, for the avoidance of doubt, all Permitted Liens), all such properties and assets are free and clear of Liens.

4.5    **Compliance with Laws; Permits.** To the knowledge of the Responsible Officers of each Borrower, Borrowers are not (a) in violation of any applicable laws, rules, regulations, executive orders, or codes (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change, or (b) subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change. To the knowledge of the Responsible Officers of each Borrower, Borrowers are in material compliance with, and have, all Permits required for the operation of their respective businesses, and for the execution, delivery and performance by, and enforcement against, Borrowers of each Loan Document. Borrowers are not in material breach of or default under the provisions of any such Permit, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in any of the foregoing.

4.6    **Fraudulent Transfer.** No transfer of property is being made by any Borrower and no obligation is being incurred by any Borrower in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Borrower.

4.7    **Intellectual Property.** Each Borrower owns directly, or is entitled to use by license or otherwise, all Intellectual Property material to such Borrower's business. All Intellectual Property material to such Borrower's business is properly maintained, subsisting, in full force and effect and not in known conflict with the rights of any Person. Each Borrower has made all filings and recordations necessary in the exercise of reasonable and prudent business judgment to protect its interest in its Intellectual Property. No actions, suits, proceedings or investigations are pending or, to the knowledge of any Borrower, threatened with respect to the validity, enforceability, infringement, use or ownership of any Borrower's Intellectual Property.

4.8    **Complete Disclosure.** All financial statements and other factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about the Borrowers' industry) furnished on or before the date hereof by or on behalf of any Borrower in writing to Lender (including all information contained in the Schedules

hereto or in the other Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents are true and accurate, in all material respects, on the date as of which such information is dated or certified and do not omit to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.

4.9    **Intentionally Deleted.**

4.10    **Payment of Taxes.** (a) All United States federal, state and other material tax returns and reports of each Borrower required to be filed by any of them have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees and other governmental charges upon any Borrower that are due and payable, other than taxes that are the subject of a Permitted Protest or that accrued prepetition and which Borrowers have no authority to pay as a result of the commencement of the Bankruptcy Case, have been paid when due and payable, (b) each Borrower have made adequate provision in accordance with GAAP for all material postpetition taxes not yet due and payable, and (c) no Borrower knows of any proposed tax assessment against any Borrower with respect to United States federal or state taxes that is the subject of a Permitted Protest.

4.11    **Governmental Regulation.** Neither of the Borrowers is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. Neither of the Borrowers is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.12    **Budget.**  The Initial Budget represents, and each subsequent Budget will represent, the Borrowers' estimate, on the date hereof, of the Borrowers' future performance for the periods covered thereby based upon the Borrowers' assumptions believed by Borrowers to be reasonable at the time of the delivery thereof to Lender.

4.13    **Environmental Matters.** The Borrowers are in compliance, in all material respects, with all Environmental Laws (as hereinafter defined), including, without limitation, all Environmental Laws in jurisdictions in which the Borrowers own or operate, or have owned or operated, a facility or site, store Collateral, arrange or have arranged for disposal or treatment of hazardous substances, solid waste or other waste, accepts or have accepted for transport any hazardous substances, solid waste or other wastes or holds or has held any interest in real property or otherwise.  No litigation or proceeding arising under, relating to or in connection with any Environmental Law is pending or, to the best of any Borrower's knowledge, threatened against any Borrower, any real property in which the Borrower holds or has held an interest or any past or present operation of any Borrower.  No release, threatened release or disposal of hazardous waste, solid waste or other wastes is occurring, or to the best of any Borrower's knowledge has occurred, on, under or to any real property in which any Borrower holds or has held any interest or performs or has performed any of its operations, in violation of any Environmental Law.  As used in this Section, "litigation or proceeding" means any demand, claim notice, suit, suit in equity, action, administrative action, investigation or inquiry whether brought by a governmental authority or other person.

## 5.    AFFIRMATIVE COVENANTS.

Each Borrower covenants and agrees that, until payment in full of the Obligations, each Borrower shall:

5.1    **Financial Statements, Reports, Certificates.** Provide to the Lender:

(a)    commencing on the first Wednesday to occur after the first Friday after the Filing Date and on each Wednesday of each week thereafter, the Variance Report;

(b)    commencing on the first Wednesday to occur after the first Friday after the Filing Date and on each Wednesday of each week thereafter, the Proposed Budget Amendment, if any, for the period beginning on the successive week; and

(c)    commencing on the first Wednesday to occur after the first Friday after the Filing Date and on each Wednesday of each week thereafter, a report showing Borrower's accounts payable and accounts receivable as of the close of business on the preceding Friday, as well as, in all reports after the first such report, a reconciliation to the prior week's report;

(d)    promptly upon their becoming available, copies of (i) all financial statements, reports, notices and proxy statements sent or made available generally by Borrowers to their security holders acting in such capacity, (ii) all press releases and other statements made available generally by any Borrower to the public concerning material developments in the business of any Borrower, excluding Borrowers' public filings in the Bankruptcy Case and (iii) such other information and data with respect to any Borrower as from time to time may be reasonably requested by Lender; and

(e)    commencing on the first Business Day after the Filing Date and on each Business Day thereafter, a daily cash report setting forth (x) the balance in each of the Borrowers' deposit accounts and (y) the Borrowers' aggregate unrestricted cash in all such accounts excluding the Funding Account (minus the aggregate amount of all outstanding checks, debits, offsets or similar obligations) as of the close of business of the immediately prior Business Day, in form and substance acceptable to Lender, certified by a Responsible Officer of Lead Borrower as being true and accurate (the "Daily Cash Report").

5.2    **Other Notices.** Provide to Lender each of the following:

(a)    Promptly upon any Responsible Officer of any Borrower obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to any Borrower with respect thereto; (ii) [reserved]; or (iii) of the occurrence of any event or change that has resulted in, or would reasonably be expected to result in, either individually or in the aggregate, a Material Adverse Change, a certificate of a Responsible Officer specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action such Borrower has taken, is taking and proposes to take with respect thereto.

(b)    Promptly upon any Responsible Officer of any Borrower obtaining knowledge of (i) the institution of, or non-frivolous threat of, any Adverse Proceeding with asserted liabilities in excess of, or that could reasonably be expected to result in liabilities in excess of, $250,000, not previously disclosed in writing by the Borrowers to Lender, or (ii) any material development in any previously disclosed Adverse Proceeding that, in the case of either clause (i) or (ii), could be reasonably expected to result in a Material Adverse Change, or seeks to enjoin or otherwise prevent the consummation of, or to

-22-

recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to the Borrowers to enable Lender and its counsel to evaluate such matters.

(c)      Promptly upon the completion of any Chapter 11 Milestone, written notice thereof.

(d)      Promptly, and in any event at least 2 Business Days before (i) any Material Contract of any Borrower is terminated or amended in a manner that is materially adverse to such Borrower, as the case may be, or (ii) any new Material Contract is entered into, a written statement describing such event, with copies of such material amendments or new contracts, delivered to Lender (to the extent such delivery is permitted by the terms of any such Material Contract, <u>provided</u>, no such prohibition on delivery shall be effective if it were bargained for by the applicable Borrower with the intent of avoiding compliance with this <u>Section 5.2(d)</u>), and an explanation of any actions being taken with respect thereto.

(e)      [reserved].

(f)      With reasonable promptness, written notice of any change in the board of directors (or similar governing body) of any Borrower.

5.3      **Collateral Reporting.** Promptly to notify Lender if any material portion of the Collateral is damaged or destroyed.

5.4      **Existence.** At all times (a) maintain and preserve in full force and effect its existence (including being in good standing in its jurisdiction of formation) and (b) maintain all its rights and franchises, licenses and permits, except where the failure to maintain any such rights and franchises, or licenses and permits, could not reasonably be expected to result in a Material Adverse Change.

5.5      **Maintenance of Properties And Intellectual Property; Permits.** Except where the failure to do so could not be expected to result in a Material Adverse Change, (a) maintain and preserve all of its assets that are necessary to the proper conduct of its business in good working order and condition, ordinary wear, tear, and casualty excepted and Permitted Dispositions excepted, (b) comply with the material provisions of all material leases to which it is a party as lessee, so as to prevent the loss or forfeiture thereof, unless such provisions are the subject of a Permitted Protest and (c) maintain, comply with and keep in full force and effect its Permits and its Intellectual Property, except as could not be expected to result in a Material Adverse Change.

5.6      **Taxes.** Cause all assessments and taxes imposed, levied, or assessed against any Collateral for the postpetition period to be paid in full, before delinquency or before the expiration of any extension period, unless such assessment or tax is subject to a Permitted Protest.

5.7      **Inspection.** Permit Lender and each of its duly authorized representatives or agent to visit any of its properties and inspect any of its assets or non-privileged books and records, to conduct appraisals and valuations, to examine and make copies of its non-privileged books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees, accountants and other advisors at such reasonable times and intervals as Lender may reasonably require during regular business hours and, so long as no Event of Default exists, with reasonable prior notice to Borrowers.

5.8 **Compliance with Laws.** Comply, and shall cause all other Persons, if any, on or occupying any Facilities to comply, with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

5.9 **[Reserved].**

5.10 **Further Assurances.** At any time upon the reasonable request of Lender, execute (if applicable) or deliver to Lender any and all financing statements, fixture filings, security agreements, pledges, assignments, indorsements of certificates of title, mortgages, deeds of trust, opinions of counsel, and all other documents (collectively, the "Additional Documents") that Lender may reasonably request in form and substance reasonably satisfactory to Lender, to create, perfect, and continue perfected or to better perfect Lender's Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of Lender in any Collateral acquired by any Borrower after the Closing Date, and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents. In furtherance and not in limitation of the foregoing, each Borrower shall take such actions as Lender may request from time to time to ensure that the Obligations are secured by substantially all of the assets of the Borrowers.

5.11 **Insurance.** The Borrowers will maintain or cause to be maintained, with financially sound and reputable insurers, (i) business interruption insurance reasonably satisfactory to Lender, and (ii) casualty insurance, such public liability insurance, third party property damage insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Borrowers as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons and consistent with Borrowers' current insurance coverages.

5.12 **Use of Proceeds.** Each Borrower covenants and agrees that it shall use the proceeds of the Loans solely to the extent required to pay those expenses enumerated in the Budget as and when such expenses become due and payable.

5.13 **Cash Management.** The Borrowers shall establish a new deposit account at an institution acceptable to Lender and shall receive all loan proceeds into such account (the "Funding Account"). The Borrowers will maintain all deposit and cash management services during the Commitment Period in a manner consistent with the Orders.

5.14 **TMO Master Services Agreement.** The Borrowers shall continue to perform at all times under and remain in compliance in all material respects with the TMO Master Services Agreement; provided that any actual or imminently threatened interruption or material degradation of service to the end customers served under the TMO Master Services Agreement shall be considered to be a violation of the foregoing covenant.

## 6. NEGATIVE COVENANTS.

Each Borrower covenants and agrees that, and without the prior consent of Lender, until payment in full of the Obligations, such Borrower will not, directly or indirectly, do any of the following:

6.1 **Indebtedness.** Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

6.2    **Liens.** Create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

6.3    **Restrictions on Fundamental Changes.**Except in connection with a Plan of Reorganization or a sale approved by the Bankruptcy Court that satisfies the sale-related Chapter 11 Milestone:

(a)    Enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Stock,

(b)    Liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), or

(c)    Suspend or close a substantial portion of its or their business.

6.4    **Disposal of Assets.** Other than Permitted Dispositions or Permitted Investments, or a sale approved by the Bankruptcy Court that satisfies the sale-related Chapter 11 Milestone, convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any Collateral held by any Borrower.

6.5    **Change Name.** Change any Borrower's name, organizational identification number, state of organization or organizational identity.

6.6    **Nature of Business.** Make any change in the nature of its or their business as conducted immediately prior to the date hereof or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, however, that the foregoing shall not prevent any Borrower from (i) engaging in any business that is reasonably related or ancillary to its or their business, or (ii) complying with any requirement of the Bankruptcy Code.

6.7    **Investments**.  Make, acquire, or permit to exist any Investment other than Permitted Investments.

6.8    **Payments, Prepayments and Amendments.**

(a)    Prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Borrower, other than the Obligations in accordance with this Agreement or as may be directed by the Bankruptcy Court;

(b)    Make any payment on account of Indebtedness that has been contractually subordinated in right of payment if such payment is not permitted at such time under the subordination terms and conditions, or

(c)    Directly or indirectly, amend, modify, or change any material terms or provisions of:

(i)    any agreement, instrument, document, indenture, or other writing evidencing or concerning Permitted Indebtedness other than the Obligations in accordance with this Agreement, to the extent such amendments, modifications, or changes, individually or in the aggregate, could not reasonably be expected to be adverse to the interests of Lender,

(ii)     any Material Contract without the consent of Lender, in its reasonable discretion, or

(iii)    the Organizational Documents of any Borrower; or

(d)     use any Loans to make any payment or prepayment to the Senior Lender on account of the obligations owing under the Senior Loan Documents or otherwise.

6.9     **Change of Control.** Cause, permit, or suffer, directly or indirectly, any Change of Control.

6.10    **Restricted Junior Payment.** Make any Restricted Junior Payment except for the payment of any management, advisory or similar fees that are included in the Budget.

6.11    **Accounting Methods.** Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

6.12    **Transactions with Affiliates.** Directly or indirectly enter into or permit to exist any transaction with any Borrower or any Affiliate of any Borrower or any of their respective Subsidiaries (except for transactions that are (a) in the ordinary course of such Borrower's business, including intercompany transactions among any Borrower or any of their respective Subsidiaries and their Affiliates; (b) upon fair and reasonable terms that are no less favorable to such Borrower than would be obtained in an arm's length transaction with a non-Affiliate, and (c) are fully disclosed to Lender).

6.13    **Limitation on Capital Expenditures.** Except as set forth in the Budget, make or incur any Capital Expenditure.

6.14    **Sales and Lease Backs.** Become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Person (a) has sold or transferred or is to sell or to transfer to any other Person (other than any Borrower), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Person to any other Person (other than any Borrower) in connection with such lease.

6.15    **Bankruptcy Case.** Seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to the Orders; (ii) a priority claim for any administrative expense or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in Section 503(b) or 507(b) of the Bankruptcy Code or, from and after the entry of the Final Order, Section 506(c) of the Bankruptcy Code) equal to or superior to the priority claim of Lender in respect to the Obligations; and (iii) any Lien on any Collateral having a priority equal or superior to the Liens in favor of Lender in respect of the Obligations, other than the Permitted Senior Liens.

6.16    **Plan**. Propose and/or support any plan or reorganization that fails to indefeasibly and finally satisfy all Obligations on the effective date of said plan in cash.

6.17    **Subsidiaries**. Neither any Borrower nor any of their respective Subsidiaries may form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Closing Date without the consent of Lender.

6.18    **Failure to Comply with Budget**. Make any expenditures not authorized or in excess of the Budget, subject to a permitted variance of 20% in excess of the projected disbursements on a line-item and aggregate basis over a rolling two-week period (with testing commencing on the first Wednesday following the second Friday after the Filing Date and continuing on each Wednesday of each week thereafter); provided that all amounts budgeted to pay Professional Persons shall be excluded from the foregoing permitted variance and shall not be permitted any variance in excess of the Budget.

## 7.    [RESERVED]

## 8.    EVENTS OF DEFAULT.

8.1    **Event of Default.** Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

(a)    Failure to make Payments When Due. Failure by Borrowers to pay (i) the principal of and premium, if any, on any Loan whether at stated maturity, by acceleration or otherwise; or (ii) when due any interest on any Loan or any fee or any other amount due hereunder (including Lender Expenses) ; or

(b)    Breach of Certain Covenants. Failure of any Borrower to perform or comply with any term or condition contained in Sections 5.1, 5.2, 5.3, 5.4, 5.6, 5.9 and, 5.12, 5,13, 5.14 or Section 6; or

(c)    [reserved]; or

(d)    Breach of Representations, etc. Any representation, warranty, certification or other statement made or deemed made by the Borrowers in any Loan Document or in any statement or certificate at any time given by any Borrower in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e)    Other Defaults Under Loan Documents. Any Borrower shall default in the performance of or compliance with any term contained in the Orders, herein or any of the other Loan Documents, other than any such term referred to in any other Section of this Section 8.1, subject to a cure period of five (5) business days; or

(f)    Loan Documents and Collateral Matters. At any time after the execution and delivery thereof, (i) this Agreement or any other Loan Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Lender shall not have or shall cease to have a valid and perfected, first-priority (subject to Permitted Senior Liens and the Carve-Out) Lien in any Collateral purported to be covered by the Loan Documents that is perfected by the filing of a UCC financing statement or (ii) any Borrower shall contest the validity or enforceability of any Loan Document in writing or deny in writing that it has any further liability under any Loan Document; or

(g)    Bankruptcy Matters. The Bankruptcy Court enters any order, or any Borrower files a motion to seeks entry of an order, (i) amending, reversing, revoking, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order, the Final Order or any other order with respect to the Bankruptcy Case affecting in any material respect this Agreement or the Loan Documents, without Lender's consent, (ii) appointing a chapter 11 trustee or an examiner, with enlarged powers relating to the operation of the business pursuant to Section 1104 of the Bankruptcy Code (powers

beyond those set forth in Section 1106(a)(3) and (4) and 1106(b) of the Bankruptcy Code) in the Bankruptcy Case, (iii) dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (iv) granting relief from the automatic stay to any creditor holding or asserting a Lien or reclamation claim on the assets of the Borrowers to permit such creditor to foreclose upon or to reclaim Collateral with a value in excess of $250,000; or

(h)     <u>Violation of DIP Order</u>.  Any of the Debtors violate the Orders; or

(i)     <u>Collateral Matters in Bankruptcy</u>. If a motion shall be filed (i) seeking to obtain additional financing under Section 364 of the Bankruptcy Code and to use cash collateral of Lender under Section 363(c) of the Bankruptcy Code without the consent of Lender, (ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code without the consent of Lender, or (iii) to take any other action or actions adverse to Lender or its rights and remedies hereunder or under any of the other Loan Documents or any of the documents evidencing or creating Lender's interest in any of the Collateral; or

(j)     <u>Cash Collateral</u>. If any Borrower uses cash collateral other than in accordance with the terms of an order approving its use entered by the Bankruptcy Court; or

(k)     <u>Material Adverse Change</u>. If any Material Adverse Change shall occur; or

(l)     [reserved]; or

(m)     <u>Dissolution</u>. Any order, judgment or decree shall be entered against any Borrower decreeing the dissolution or split up of such Person and such order shall remain undischarged or unstayed for a period in excess of 30 days; or

(n)     <u>Chapter 11 Milestones</u>. Borrowers shall have failed to fully, completely and timely comply with any Chapter 11 Milestones set forth in the Orders unless otherwise waived or consented to in writing by Lender.

8.2     **Rights and Remedies.** Subject to the terms of the Orders, at any time on or after the occurrence of an Event of Default, and notwithstanding the provisions of Section 362 of the Bankruptcy Code, Lender may, by written notice to Borrowers, and in addition to any other rights or remedies provided for hereunder or under any other Loan Document (including, without limitation, the Orders) or by the UCC or any other applicable law, do any one or more of the following:

(a)     terminate the Loan Commitment;

(b)     declare the Obligations, whether evidenced by this Agreement or by any of the other Loan Documents immediately due and payable, whereupon the same shall become and be immediately due and payable, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by the Borrowers; and

(c)     obtain and liquidate the Collateral.

Notwithstanding the foregoing and for the avoidance of doubt, the occurrence of any Event of Default described in <u>Sections 8.1(g)</u> shall automatically trigger the Maturity Date pursuant to which the rights and remedies described in this <u>Section 8.2(a)</u> and <u>(b)</u> shall occur without the need for any notice to be delivered from the Lender to the Borrowers.

8.3   **Remedies Cumulative.** The rights and remedies of Lender under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it.

## 9.   PRIORITY AND COLLATERAL SECURITY.

9.1   **Grant of Security Interest**. As security for all Obligations, each Borrower hereby grants to the Lender a security interest in and continuing lien on all of such Borrower's right, title and interest in, to and under all personal property of such Borrower including the following, in each case whether now owned or existing or hereafter acquired or arising and wherever located (all of which being hereinafter collectively referred to as the "Collateral"):

(a)   Accounts;

(b)   Chattel paper, including electronic chattel paper or tangible chattel paper;

(c)   Deposit Accounts;

(d)   Documents;

(e)   General Intangibles;

(f)   Goods, including all Inventory and equipment (in each case, regardless of whether characterized as goods under the UCC);

(g)   Instruments;

(h)   Insurance;

(i)   Intellectual Property;

(j)   Investment Related Property;

(k)   Letter of Credit Rights;

(l)   Money;

(m)   Receivables and Receivable Records;

(n)   Commercial Tort Claims;

(o)   to the extent not otherwise included above, all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and

(p)   to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.

9.2   **Certain Limited Exclusions.** Notwithstanding anything herein to the contrary, in no event shall the Collateral include or the security interest granted under Section 9.1 attach to any

Avoidance Actions or Avoidance Proceeds (as defined in the Orders) or any lease, license, contract, property rights or agreement to which any Borrower is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of such Borrower therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity); provided that the Collateral shall include and such security interest shall attach immediately at such time as the condition causing such abandonment, invalidation or unenforceability shall be remedied and to the extent severable, shall attach immediately to any portion of such lease, license, contract, property rights or agreement that does not result in any of the consequences specified in clause (i) or (ii) above. Notwithstanding the foregoing, the Collateral shall include any Proceeds, substitutions or replacements of any of the property described above (unless such Proceeds, substitutions or replacements would constitute property described above).

      9.3    **Collateral Security.**  Each Borrower warrants and covenants that, except as otherwise expressly provided in this paragraph, upon the entry of the applicable Order, the Obligations of each Borrower under the Loan Documents:

      (a)    Pursuant to Sections 361, 362, 364(c)(2), and 364(c)(3) of the Bankruptcy Code and the Security Instruments, shall at all times be secured by, and each Borrower hereby grants to Lender, a continuing, valid, binding, enforceable, non-avoidable and automatically properly perfected post-petition security interest and first priority (subject only to Permitted Senior Liens and the Carve-Out) Lien on all of such Borrower's rights in the Collateral existing and after acquired, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Borrower and the proceeds thereof, including property received thereby whether by judgment, settlement or otherwise

      (b)    Such Liens referred to in Section 9.1 shall be senior in priority to all other Liens on the assets and properties of such Borrower other than Permitted Senior Liens and the Carve-Out.

      (c)    The amounts received by Borrowers under this Agreement may not be used to investigate or challenge the validity, perfection, priority, extent or enforceability of any Loan Document, or the Liens or security interests granted thereunder.

      9.4    **No Discharge; Survival of Claims.** Pursuant to Section 1141(d)(4) of the Bankruptcy Code, each Borrower hereby waives any discharge of the Obligations with respect to any plan of reorganization that shall not provide for the payment in full in cash of the Obligations (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) under this Agreement.

## 10.    WAIVERS; INDEMNIFICATION.

      10.1    **Demand; Protest; etc..** Each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Lender on which any Borrower may in any way be liable.

10.2   **Lender's Liability for Collateral.** Each Borrower hereby agrees that: (a) so long as Lender complies with its obligations, if any, under the UCC, Lender shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by such Borrower, except any thereof resulting from the gross negligence, bad faith or willful misconduct of Lender as finally determined by a court of competent jurisdiction.

10.3   **Indemnification.** Each Borrower shall pay, indemnify, defend, and hold the Lender and the other Lender-Related Persons (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable and documented out-of-pocket fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them in connection with or as a result of or related to the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of the Borrowers' compliance with the terms of the Loan Documents (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, no Borrower shall have any obligation to any Indemnified Person under this Section 10.3 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence, fraud or willful misconduct of such Indemnified Person or its officers, directors, employees, attorneys, or agents. This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which any Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Borrower with respect thereto. **WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.**

10.4   **General Release; Covenant Not to Sue.**

(a)   **EACH BORROWER, ON BEHALF OF ITSELF ITS AGENTS, REPRESENTATIVES, SUBSIDIARIES, HEIRS, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "RELEASORS"), HEREBY FOREVER WAIVES, RELEASES, HOLDS HARMLESS, ACQUITS AND DISCHARGES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE LENDER AND OTHER LENDER-RELATED PERSONS (COLLECTIVELY, THE "RELEASEES") FROM ANY AND ALL CLAIMS, LOSSES, LIABILITIES, DAMAGES, INTERESTS AND CAUSES OF ACTION OF ANY KIND OR NATURE BY, ON BEHALF OF, OR THROUGH THE BORROWER (COLLECTIVELY, THE "CLAIMS") THAT THE BORROWER HAS, HAD OR MAY HAVE AGAINST ANY OF THE RELEASEES BASED ON FACTS ARISING ON OR BEFORE THE DATE HEREOF THAT RELATE TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR OTHER TRANSACTIONS OR DEALINGS BETWEEN ANY BORROWER AND ANY RELEASEE CONTEMPLATED HEREBY OR THEREBY. THE FOREGOING TO THE CONTRARY NOTWITHSTANDING, NO BORROWER SHALL RELEASE ANY RELEASEE UNDER THIS SECTION 10.4 WITH RESPECT TO ANY CLAIM THAT A COURT OF COMPETENT JURISDICTION FINALLY**

**DETERMINES TO HAVE RESULTED FROM THE GROSS NEGLIGENCE, FRAUD OR WILLFUL MISCONDUCT OF SUCH RELEASEE OR ITS OFFICERS, DIRECTORS, EMPLOYEES, ATTORNEYS, OR AGENTS. THE PROVISIONS OF THIS SECTION 10.4 SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.**

> **(b)     To the fullest extent permitted by law, each Borrower, on behalf of itself and the other Releasors, hereby unconditionally and irrevocably agrees that it will not sue any Releasee on the basis of any Claim released, remised and discharged by any Releasor pursuant to Section 10.4(a) above. If any Borrower or other Releasor violates the foregoing covenant, each of the Borrowers, for itself and the other Releasors (as applicable), agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.**

## 11.     NOTICES.

All notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or facsimile. In the case of notices or demands to any Borrower hereunder or any service of process to any Borrower or Lender, as the case may be, they shall be sent to the respective address set forth below:

|  |  |
|---|---|
| If to any Borrower: | MobiTV, Inc.<br>1900 Powell Street, Ninth Floor<br>Emeryville, CA  94608<br>Attn: Terri Stevens<br>Email: tstevens@mobitv.com |
| with a copy to:<br>(which shall not<br>constitute notice) | Pachulski Stang Ziehl & Jones LLP<br>919 North Market Street, 17th Floor<br>Wilmington, DE 19801<br>Attn:  Mary Caloway<br>Email:  mcaloway@pszjlaw.com |
| If to Lender: | TVN Ventures, LLC<br>3655 131st Avenue SE<br>Bellevue, WA 98006<br>Attn: General Counsel<br>Email: Broady.Hodder@T-Mobile.com |
| with copies to:<br>(which shall not<br>constitute notice) | Alston & Bird LLP<br>One Atlantic Center, Suite 4900<br>1201 W. Peachtree St.<br>Atlanta, GA  30309-3424<br>Attn: William Sugden and Jacob Johnson<br>Email: will.sugden@alston.com<br>          Jacob.johnson@alston.com |

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this <u>Section 11</u>, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail; <u>provided</u>, <u>that</u> (a) notices sent by overnight courier service shall be deemed to have been given when received and (b) notices by electronic mail shall be deemed received when sent. If any notice, disclosure, or report is required to be delivered pursuant to the terms of this Agreement on a day that is not a Business Day, such notice, disclosure, or report shall be deemed to have been required to be delivered on the immediately following Business Day.

## 12.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

(a)    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT SO LONG AS THE BANKRUPTCY CASE IS PENDING AND, THEREAFTER, IN THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN DELAWARE; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH BORROWER AND THE LENDER WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF <u>FORUM NON CONVENIENS</u> OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 12(b)</u>; <u>PROVIDED, FURTHER</u>, <u>HOWEVER</u>, THAT ALL PARTIES HEREBY AGREE THAT THEY HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT.

(c)    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH BORROWER AND THE LENDER HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWER AND LENDER REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

## 13.    AMENDMENTS; WAIVERS; SUCCESSORS; INDEMNIFICATION.

### 13.1    <u>Amendments and Waivers</u>.

No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Lender and each Borrower and then any

such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

13.2 **No Waivers; Cumulative Remedies.** No failure by Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Lender in exercising the same, will operate as a waiver thereof. No waiver by Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Lender on any occasion shall affect or diminish Lender's rights thereafter to require strict performance by the Borrowers of any provision of this Agreement. Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Lender may have.

13.3 **Successors.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, neither party may assign this Agreement or any rights or duties hereunder without the other party's prior written consent and any prohibited assignment shall be absolutely void *ab initio*. No consent to assignment by Lender shall, unless otherwise provided in such consent, release the Borrowers from their Obligations. Notwithstanding the foregoing, the Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder or assign the Loans or its Loan Commitment (in whole or in part) to any Affiliate without notice to or consent of the Borrowers.

13.4 **Costs and Expenses; Indemnification.** Lender may incur Lender Expenses for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorney's fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral. Subject to the terms of the Orders, the Borrowers shall promptly pay and reimburse the Lender for all reasonable and documented out-of-pocket expenses (including, but not limited to, reasonable legal fees and expenses and expenses incurred in connection with due diligence, travel, courier, reproduction, printing and delivery expenses) of the Lender associated with the preparation, execution, delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the Loan Documents. The undertaking in this Section shall survive the payment of all Obligations hereunder.

## 14. GENERAL PROVISIONS.

14.1 **Effectiveness.** This Agreement shall be binding and deemed effective when executed by the Borrowers and Lender.

14.2 **Section Headings.** Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

14.3 **Interpretation.** Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender or the Borrowers, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

14.4 **Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

14.5     **Non-Fiduciary Relationship.** Lender does not have (and shall not be deemed to have) any fiduciary relationship or duty to Borrowers arising out of or in connection with the Loan Documents or the transactions contemplated thereby.

14.6     **Counterparts; Electronic Execution.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

14.7     **Revival and Reinstatement of Obligations.** If the incurrence or payment of the Obligations by the Borrowers or the transfer to Lender of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable out-of-pocket costs, expenses, and attorney's fees of Lender related thereto, the liability of the Borrowers automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

14.8     **Lender Expenses.** Subject to the terms of the Orders, the Borrowers agree to pay any and all Lender Expenses promptly after demand therefor by Lender and agree that its respective obligations contained in this Section 14.8 shall survive payment or satisfaction in full of all other Obligations.

14.9     **Integration.** This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

[Signature pages follow.]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**BORROWERS:**

**MOBITV, INC.**

By: _____

Name:  Terri Stevens

Title:    Chief Financial Officer

**MOBITV SERVICE CORPORATION**

By: _____

Name:  Terri Stevens

Title:    Chief Financial Officer

**LENDER:**

**TVN VENTURES, LLC**

By: _Dow Draper_

Name: Dow Draper

Title: Authorized Signatory

**Exhibit A          Form of Funding Notice**

[*Date*]

TVN Ventures, LLC,
    as Lender
3655 131st Avenue SE
Bellevue, WA 98006
Attn:
Email:

Ladies and Gentlemen:

Reference is made to that certain Debtor-in-Possession Loan and Security Agreement dated as of March 1, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among MobiTv, Inc., as the Lead Borrower, MobiTV Service Corporation and TVN Ventures, LLC, as the Lender.  Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Loan Agreement.

This notice constitutes a Funding Notice delivered pursuant to Section 2.1(b) of the Loan Agreement. The Borrower hereby requests a Loan in an amount equal to $[_____] to be made by the Lender on [____ __][1], 2021 (the "Credit Date").

The Borrower hereby represents and warrants that all conditions to funding set forth in Section 3.2 of the Loan Agreement are satisfied at the time of the delivery of this Funding Notice and shall be satisfied immediately after giving effect to the funding of the Loan requested hereby.

Without limiting the foregoing, the amount of the Loan requested hereby does not exceed the lesser of (i) the Loan Commitment in effect minus the principal amount of all Loans made prior to the date hereof and (ii) the aggregate principal amount of Loans anticipated to be needed for the week that includes the proposed Credit Date, as set forth in the Budget, less the principal amount of Loans previously made during such week.

Very truly yours,

**MOBITV, INC.**

By: _____
       Name:
       Title:

---

[1] Note to MobiTV:  Funding notice must be provided by 11am eastern time two (2) Business Days before requested Credit Date.

**Exhibit B**　　　　　　**Form of Interim Order**

**[Filed separately]**

**Exhibit C**               **Preliminary Budget**

**[Filed separately]**

**Schedule A-1**          **Loan Account**

**[To be provided]**