# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MOBITV, INC., *et al.,* [1] | Case No. 21-10457 (LSS) |
| Debtor. [1] | |

**<u>AFFIDAVIT OF PUBLICATION OF THE NOTICE OF DEADLINES FOR THE FILING OF (I) PROOFS OF CLAIM, INCLUDING REQUESTS FOR PAYMENT PURSUANT TO SECTION 503(B)(9) OF THE BANKRUPTCY CODE, (II) ADMINISTRATIVE CLAIMS, AND (III) REJECTION DAMAGES CLAIMS</u>**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: MobiTV, Inc. (2422) and MobiTV Service Corporation (8357). The Debtors' mailing address is 1900 Powell Street, 9th Floor, Emeryville, CA 94608.



# PROOF OF PUBLICATION

Apr-30, 20 21

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of The New York Times a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

Apr 30, 2021, NYT & Natl, pg B6

Sworn to me this 30th day of April, 2021

_____
Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

---

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: MOBITV, INC., et al., Debtors.[1]
Chapter 11
Case No. 21-10457 (LSS)
Jointly Administered

**NOTICE OF DEADLINES FOR THE FILING OF (I) PROOFS OF CLAIM, INCLUDING REQUESTS FOR PAYMENT PURSUANT TO SECTION 503(b)(9) OF THE BANKRUPTCY CODE, (II) ADMINISTRATIVE CLAIMS, AND (III) REJECTION DAMAGES CLAIMS**

THE CLAIMS BAR DATE IS JUNE 15, 2021
THE GOVERNMENTAL CLAIMS BAR DATE IS AUGUST 30, 2021
THE ADMINISTRATIVE CLAIMS BAR DATE IS JUNE 15, 2021
PLEASE TAKE NOTICE OF THE FOLLOWING:

*Deadlines for Filing Proofs of Claim and Administrative Claims Arising Prior to the Administrative Claim Deadline.* On April 27, 2021, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. 215] (the "Bar Date Order") establishing certain dates by which parties holding prepetition claims against the above-captioned Debtors must file (a) proofs of claim ("Proofs of Claim"), including claims by governmental units, claims arising under section 503(b)(9) of the Bankruptcy Code, and Rejection Damages Claims, and (b) requests for payment of Administrative Claims (as defined herein) arising on or prior to the Administrative Claims Deadline (as defined herein). in the chapter 11 cases of MobiTV, Inc. and MobiTV Service Corporation (together, the "Debtors"):

*The Bar Dates.* Pursuant to the Bar Date Order, *all* entities (except governmental units), including individuals, partnerships, corporations, joint ventures, estates, and trusts who have a claim or potential claim against the Debtors, that arose prior to March 1, 2021, no matter how remote or contingent such right to payment or equitable remedy may be, *including* requests for payment under section 503(b)(9) of the Bankruptcy Code, MUST FILE A PROOF OF CLAIM on or before **June 15, 2021, at 5:00 p.m., prevailing Eastern Time** (the "Claims Bar Date"). Governmental units who have a claim or potential claim against the Debtors that arose prior to the Petition Date, no matter how remote or contingent such right to payment or equitable remedy may be, MUST FILE A PROOF OF CLAIM on or before **August 30, 2021, at 5:00 p.m., prevailing Eastern Time** (the "Governmental Bar Date").

*Administrative Claims Bar Date.* Parties asserting Administrative Claims against the Debtors' estates arising on or prior to May 31, 2021 (the "Administrative Claims Deadline") (but excluding claims for fees and expenses of professionals retained in these proceedings), are required to file a request for payment of such Administrative Claim arising on or prior to the Administrative Claims Deadline with the Court on or before **June 15, 2021, at 5:00 p.m., prevailing Eastern Time** (the "Administrative Claims Bar Date").

ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM, INCLUDING ANY REQUEST FOR PAYMENT UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE, OR WHO FAILS TO FILE WITH THE COURT AN ADMINISTRATIVE CLAIM ARISING ON OR PRIOR TO THE ADMINISTRATIVE CLAIMS DEADLINE, IN EACH CASE ON OR BEFORE THE APPLICABLE BAR DATE, SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.

*Filing a Proof of Claim.* Each Proof of Claim must be filed, including supporting documentation, so as to be *actually received* by Stretto, the claims and noticing agent retained in these chapter 11 cases, on or before the applicable Claims Bar Date or the Governmental Bar Date (or, where applicable, on or before any other bar date as set forth herein or by order of the Court) either (1) electronically through the interface available at https://cases.stretto.com/MobiTV or (2) by first class, overnight U.S. mail, or by other hand delivery system at the following address: MobiTV Claims Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602. **PROOFS OF CLAIM SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED.**

*Contents of Proofs of Claim.* Each Proof of Claim must: (i) be written in English; (ii) include a claim amount denominated in United States dollars; (iii) conform substantially with Official Form 410; and (iv) be signed by the claimant or by an authorized agent or legal representative of the claimant.

*Supporting Documentation.* Each Proof of Claim must include supporting documentation in accordance with Bankruptcy Rules 3001(c) and (d). If, however, such documentation is voluminous, upon prior written consent of Debtors' counsel, such Proof of Claim may include a summary of such documentation or an explanation as to why such documentation is not available; *provided* that any creditor that received such written consent shall be required to transmit such writings to Debtors' counsel upon request no later than ten days from the date of such request.

Dated: April 27, 2021, Wilmington, Delaware
**PACHULSKI STANG ZIEHL & JONES LLP,** /s/ *Mary F. Caloway*
Debra I. Grassgreen (admitted *pro hac vice*), Jason H. Rosell (admitted *pro hac vice*), Mary F. Caloway (DE Bar No. 3059), 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899 (Courier 19801), Telephone: 302-652-4100, Facsimile: 302-652-4400, E-mail: dgrassgreen@pszjlaw.com, jrosell@pszjlaw.com, mcaloway@pszjlaw.com, *Attorneys for the Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: MobiTV, Inc. (2422) and MobiTV Service Corporation (8357). The Debtors' mailing address is 1900 Powell Street, 9th Floor, Emeryville, CA 94608.

HISTORY | SOCIAL MEDIA | ECONOMY

# America's Oldest Whiskey? Pay $40,000, if the Spirit Moves You.

**By CLAY RISEN**

When Joseph Hyman, a rare spirits specialist for Skinner Auctioneers, first examined the brown-glass flask that his employer was preparing to sell, he already suspected it was one of the oldest bottles of American-made whiskey he'd ever seen.

For one thing, it was embossed with the name "Evans & Ragland," a grocer and whiskey bottler that operated in LaGrange, Ga., for about a decade after the Civil War. And a typed note taped to the back suggested that the whiskey had been distilled before 1865, since there were no known distilleries in Georgia after the war that might have sold it to Evans & Ragland to bottle. Mr. Hyman figured it might have been made in the 1850s, then stored until after the fighting ended.

To authenticate it, Mr. Hyman used a syringe to extract a small sample and worked with labs at the University of Georgia and the University of Glasgow to analyze it. The results shocked him: Radiocarbon dating indicated, with 81 percent accuracy, that the whiskey was distilled between 1763 and 1803, making it by far the oldest American whiskey in existence.

"It was a cool story beforehand," Mr. Hyman said. "But once the tests came back, it became a monster of a story. It's still blowing my mind."

Skinner plans to sell the bottle in late June, and expects a hammer price of up to $40,000 — evidence of the booming interest in rare American whiskey, especially whiskey made before Prohibition. But even if Mr. Hyman is right — and some skeptics have taken issue with his conclusions — the bottle's provenance asks more questions than it answers about some of the deeper reaches of American whiskey history.

Even without its record-setting age, the whiskey is an intriguing piece of Americana. The grandfather of the current owner, who remains anonymous, received it as a gift from Gov. James F. Byrnes of South Carolina, a former U.S. Supreme Court justice and close friend of President Franklin D. Roosevelt.

Mr. Byrnes received it from Jack Morgan, the son of the financier J.P. Morgan, who also gave bottles of the same whiskey to Roosevelt and Harry S. Truman. Though Jack Morgan wasn't much of a drinker, his father was, and owned a renowned wine and spirits collection that included whiskeys that were already ancient by the time he bought them in the late 19th century.

This particular bottle came as part of a large set of bottles, mostly Maryland rye, that he bought from a wealthy Baltimore landowner around 1900. But how it got from LaGrange, a small city southwest of Atlanta, to Baltimore, no one knows.

The more intriguing question, Mr. Hyman said, is how the whiskey got to Evans & Ragland in the first place. Although by the mid-19th century there were several large commercial distilleries along the East Coast and the Ohio River Valley, most whiskey, especially in Georgia, was made by small farmers, who used it to barter or sold it to retailers like Evans & Ragland.

"Everybody was distilling any kind of produce they had left over, because if they didn't it would rot," he said. "It was a way to extend the growing season into the winter."

But how to explain the gap of more than 50 years between distillation and bottling? The whiskey could not have sat in a barrel that whole time, Mr. Hyman said; it would have evaporated through the wood.

Instead, he speculates that it was aged briefly in a wooden barrel, then stored in a glass or ceramic container called a demijohn, a common practice at the time. Perhaps forgotten, it could have sat in a warehouse or barn for decades before someone discovered it.

That's all informed guesswork, Mr. Hyman admitted, adding that all sorts of questions remain unanswered, and perhaps unanswerable.

For example, the bottle says that the whiskey came from the "Old Ingledew" distillery, a name that appears almost nowhere else in the historical record, not even in the Troup County Archives in LaGrange. Did "Old Ingledew" even exist? Or was it a name conjured up by Evans & Ragland to give some prestige to a local farmer's hooch?

It's not even clear what, exactly, the liquid is. It's not bourbon, as some reports have called it. A separate chemical analysis showed that the main ingredient was corn, making it similar to bourbon — though no one would have used that term, which emerged in the early 1800s in Kentucky.

At the time, drinkers would surely have called it whiskey, a catchall term for grain-based spirits, but today there are federally enforced rules about what does and does not qualify as whiskey or bourbon, like whether it was aged, and in what sort of barrel.

The lack of answers has some whiskey historians wondering if Mr. Hyman is drawing too firm a conclusion from too thin a stack of evidence.

"I'm skeptical that it really is from the 18th century," said Michael R. Veach, the author of "Kentucky Bourbon Whiskey: An American Heritage." "It wouldn't have been aged. It would have been put straight into a jug, because it was like money, and if you had put it into a barrel some of it would have been soaked into the wood and lost."

Adam Herz, the founder of the L.A. Whisk(e)y Society who has confirmed the age of several bottles of mid-19th century whiskey, questioned whether the analysis was rigorous enough, saying it should have been conducted with control samples and peer review (though he also admits to his own potential bias: He holds the record for identifying the bottle of American whiskey, a rye made in 1847, previously thought to be the oldest).

Mr. Hyman stands by the analysis, noting that the lab at the University of Glasgow is widely regarded as the best in the world for dating old whiskey.

Of course, for many would-be buyers, there's a question just as important as where the whiskey came from: What does it taste like?

Mr. Hyman said he managed to keep aside a few drops of his sample, which he rubbed on his hand, smelled, then put to his lips.

"It tasted," he said, "like bourbon."

> It may have been stored in a glass or ceramic demijohn.



SKINNER AUCTIONEERS

A rare spirits specialist believes a flask of whiskey bottled in LaGrange, Ga., in the decade after the Civil War may have been distilled as early as 1763.

---

# Impish Meme Nets Big Haul in Digital Currency

**By MARIE FAZIO**

The name Zoë Roth might not ring any bells. But chances are you've seen her photo.

One Saturday morning in 2005, when Ms. Roth was 4 years old, her family went to look at a house on fire in their neighborhood in Mebane, N.C. Firefighters had intentionally set the blaze as a controlled fire, so it was a relaxed affair: Neighbors gathered and firefighters allowed children to take turns holding the hose.

Ms. Roth remembers watching the flames engulf the house when her father, an amateur photographer, asked her to smile. With her hair askew and a knowing look in her eyes, Ms. Roth flashed a devilish smirk as the fire roared behind her. "Disaster Girl" was born.

In the years since Dave Roth, Zoë's father, entered it in a photo contest in 2007 and won, the image has been edited into various disasters from history, with Ms. Roth grinning impishly as a meteor wipes out the dinosaurs or the Titanic sinks in the distance. Now, after more than a decade of having her image endlessly repurposed as a vital part of meme canon, Ms. Roth has sold the original copy of her meme as a nonfungible token, or NFT, for nearly half a million dollars.

The meme sold for 180 Ether, a form of cryptocurrency, at an auction on April 17 to a user identified as @3FMusic. As with any currency, the value of Ether fluctuates, but as of Thursday, 180 Ether was valued at more than $495,000. The Roths retained the copyright and will receive 10 percent of future sales.

The market for ownership rights to digital art, ephemera and media known as NFTs, is exploding. All NFTs, including the "Disaster Girl" meme Ms. Roth just sold, are stamped with a unique bit of digital code that marks their authenticity, and stored on the blockchain, a distributed ledger system that underlies Bitcoin and other cryptocurrencies.

In the meme hall of fame, "Disaster Girl" ranks alongside "Ermahgerd," a pigtailed teenage girl posing with "Goosebumps" books; "Bad Luck Brian," immortalized in a grimacing yearbook photo with braces; and "Success Kid," a toddler on a beach with a clenched fist and an expression of intense determination.

In an interview, Ms. Roth said selling the meme was a way for her to take control over a situation that she has felt powerless over since she was in elementary school.

Before making the decision to sell, Ms. Roth consulted "Bad Luck Brian" himself — his real name is Kyle Craven — and Laney Griner, the mother of "Success Kid."

"It's the only thing that memes can do to take control," Ms. Roth recalled Mr. Craven telling her.

"Disaster Girl" memes have spread far and wide. Once, a group from Poland asked permission to use the meme for educational material about a dying Indigenous language. Someone in Portugal sent Ms. Roth pictures of a mural with the meme.

"You just make it fit however you want to fit it," she said. "I love seeing them because I'd never make any of them myself, but I love seeing how creative people are."

Over the years, she's seen hundreds of iterations of her picture. One shared last summer during racial justice protests was among her favorites, she said.

"Once it's out there, it's out there and there's nothing you can do about it," Mr. Roth said. "It always finds a way to stay relevant with whatever new kind of awful, terrible bad thing is happening, so I've laughed at a lot of them."

Ms. Roth, now 21, is a senior at the University of North Carolina at Chapel Hill studying peace, war and defense. She has never been recognized as "Disaster Girl" outright, she said, but most of her friends and acquaintances know of her meme fame.

"People who are in memes and go viral is one thing, but just the way the internet has held on to my picture and kept it viral, kept it relevant, is so crazy to me," she said. "I'm super grateful for the entire experience."

Even so, she said, she hopes to one day do something meaningful enough to shift "Disaster Girl" to the second page of search results for her name.

After graduation, Ms. Roth plans to take a gap year before pursuing a graduate degree in international relations. She said she would donate the fortune she has made from her likeness — which is still in cryptocurrency form — to charities and to pay off her student loans, among other things.

When she's home, she often walks past the lot where it all started and wonders if locals know that it's a "meme place," she said.

"People who are in memes didn't really have a choice in it," she said. "The internet is big. Whether you're having a good experience or a bad experience, you kind of just have to make the most of it."

Ben Lashes, who manages the Roths and stars of other memes including "Nyan Cat," "Grumpy Cat," "Keyboard Cat," "Doge," "Success Kid," "David After Dentist" and the "Ridiculously Photogenic Guy," said his clients had cumulatively made over $2 million in NFT sales.

He said that NFT sales had helped establish memes as a sophisticated art form and "serious pieces of culture."

"I think anytime you can find a collector — no matter what the price is — who respects the art behind it and is going to cherish it, that's a successful sale, whether it's one Ether or 200 or 300," he said.



DAVE ROTH

The influential 2005 photo of the "Disaster Girl," Zoë Roth, recently made her 180 Ether, valued at $495,000, at auction.

---

# Economy Finds Footing, But There's an Imbalance

FROM FIRST BUSINESS PAGE

durable goods. Spending on cars and trucks is 15.1 percent higher than it would have been on the 2019 trajectory; spending on furnishings and durable household equipment is 16.6 percent higher; and spending on recreational goods is a whopping 26 percent higher.

Altogether, durable goods spending is running $348.5 billion higher annually than it would have been in that alternate universe, as Americans have spent their stimulus checks and unused travel money on physical items.

The housing sector is experiencing nearly as big a surge. Residential investment was 14.4 percent above its prepandemic trend, representing $90 billion a year in extra activity. And that was surely constrained by shortages of homes to sell, and lumber and other materials used to make them. It is poised to soar further in coming months, based on forward-looking data like housing starts.

Another bright spot is business investment in information technology. The tech industry has been comparatively unscathed by the crisis. Spending on information processing equipment in the first quarter was 23 percent higher than its prepandemic trend, and investment in software 7.4 percent higher.

Then there are the losers. The troubles of service industries, especially related to travel, are well documented. While spending on restaurants, airline tickets, concerts and other recreational activities grew in the first quarter, it was a considerably smaller surge than the one that went to physical items, and not nearly big enough to fill in the deep hole those sectors face. Spending on transportation services remains 23 percent below its prepandemic trend, recreation services 31 percent, and restaurants and hotels 19 percent.

Those three sectors alone represent $430 billion in "missing" economic activity — largely equivalent, it's worth noting, to the combined shift of economic activity toward durable goods and residential real estate.

A corollary shows up in trade data. Services exports are down 26 percent compared with the prepandemic trend, which reflects in significant part the freeze-up in global travel.

Less widely understood is a steep pullback in the energy sector.

There are two sides of the same coin: Consumer spending on gasoline and other energy goods is down 11 percent from its prepandemic trend line. And business spending on structures is down 19 percent, which reflects a pullback in investment by both the oil extraction industry and the commercial real estate sector.

Separately, the pullback in state and local governments, many of which have faced funding crunches, is real. Their spending is 4.3 percent below the prepandemic trend, another $89 billion in lost activity, though that is likely to relax as federal stimulus dollars flow to their coffers and schools reopen.

In every recession, shifts take place in the composition of economic activity; the economy rarely looks the same after a wrenching event as it did before. But what is striking about this crisis is the scale and speed of the economy's rewiring.

We don't yet know how fully service industries will recover as vaccinations take place, or whether durable goods spending will return to more normal levels as stimulus checks are spent and people reallocate their budgets toward travel. We also don't know whether the surge in information technology spending and the pullback in oil drilling are part of a longer-term shift in the economy (all the more so given the Biden administration's emphasis on clean energy investment).

Moreover, to the degree these shifts in the composition of the economy may be semi-permanent, we don't know how seamlessly the economy will adjust. Many former waiters or hotel clerks may be ill-suited to becoming construction workers or software engineers.

That's what makes the economy of 2021 so promising but also worrying. The boom is here. We just don't know yet how bumpy the ride will be in trying to return to something that feels like full-fledged prosperity.

## The Upshot

The Upshot provides news, analysis and graphics about politics, policy and everyday life.

nytimes.com/upshot



LM OTERO/ASSOCIATED PRESS

The first-quarter G.D.P. report on Thursday showed that residential investment was 14.4 percent above its prepandemic trend.

IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

In re: MOBITV, INC., et al., Debtors.[1]

Chapter 11
Case No. 21-10457 (LSS)
Jointly Administered

NOTICE OF DEADLINES FOR THE FILING OF (I) PROOFS OF CLAIM, INCLUDING REQUESTS FOR PAYMENT PURSUANT TO SECTION 503(b)(9) OF THE BANKRUPTCY CODE, (II) ADMINISTRATIVE CLAIMS, AND (III) REJECTION DAMAGES CLAIMS

THE GOVERNMENTAL CLAIMS BAR DATE IS AUGUST 30, 2021
THE ENVIRONMENTAL CLAIMS BAR DATE IS JUNE 15, 2021
THE ADMINISTRATIVE CLAIMS BAR DATE IS JUNE 15, 2021
PLEASE TAKE NOTICE OF THE FOLLOWING:

[Full bankruptcy notice text continues with details about deadlines for filing Proofs of Claim and Administrative Claims, the Bar Dates, Administrative Claims Bar Date, Proofs of Claim procedures, Supporting Documentation requirements, and contact information for PACHULSKI STANG ZIEHL & JONES LLP / Mary F. Caloway, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899.]

ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM, INCLUDING ANY REQUEST FOR PAYMENT UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE, OR WHO FAILS TO FILE WITH THE COURT AN ADMINISTRATIVE CLAIM ARISING ON OR PRIOR TO THE ADMINISTRATIVE CLAIMS DEADLINE, IN EACH CASE ON OR BEFORE THE APPLICABLE BAR DATE, SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.

Dated: April 27, 2021, Wilmington, Delaware
/s/ Mary F. Caloway

COMMERCIAL REAL ESTATE BUSINESS OPPORTUNITIES

INVESTMENT PROPERTIES (600)
Investment Properties Other Areas — 605

ITALY COMO - UNIQUE PROPERTY
ONE OF A KIND!
7.7ha divisible, splendid view, Manor House, pool, Hangar, Plane track, 9-hole golf course.
Code +39 340 8805691
dgrasspeen@pszjlaw.com, jrosell@pszjlaw.com, mcaloway@pszjlaw.com
info@concasa.it

Jersey City Hot Neighborhood
New mixed use Resi / Com
$2.75 MM. Call 201-741-7008